ORAL ARGUMENT NOT SCHEDULED

Nos. 20-5183, 20-5208

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

LISA GUFFEY and CHRISTINE SMITH,

Plaintiffs-Appellees/
Cross-Appellants,

v.

JAMES C. DUFF, in his official capacity as
Director of the Administrative Office of the United States Courts,

Defendant-Appellant/
Cross-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## BRIEF FOR APPELLANT

JEFFREY BOSSERT CLARK
  *Acting Assistant Attorney General*
SCOTT R. MCINTOSH
WEILI J. SHAW
  *(202) 514-1371*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiffs-appellees/cross-appellants are Lisa Guffey and Christine Smith.

Defendant-appellant/cross-appellee is James C. Duff, in his official capacity as Director of the Administrative Office of the United States Courts.

There have been no amici curiae.

### B.    Rulings Under Review

Defendant and plaintiffs both appeal from the Opinion and Order entered on April 29, 2020, by Judge Christopher R. Cooper in No. 18-cv-1271 (D.D.C.).  JA 186, 188.  The Opinion is published at 459 F. Supp. 3d 227.  The Order has not been published.

### C.    Related Cases

The case on review has not previously been before this Court or any other court.  Counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

s/ Weili J. Shaw
_____
WEILI J. SHAW

# TABLE OF CONTENTS

**Page**

GLOSSARY .................................................................................................... xi

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION ................................................................. 2

STATEMENT OF THE ISSUE......................................................................... 3

PERTINENT STATUTES AND REGULATIONS.............................................. 3

STATEMENT OF THE CASE............................................................................ 4

      A.    The AO's Role in Protecting the Independence of the Judicial
           Branch.................................................................................................. 4

      B.    Restrictions on Partisan Political Activity in the Code of
           Conduct for Judicial Employees ....................................................... 12

      C.    The AO Code of Conduct.................................................................. 13

      D.    Plaintiffs' Complaint ......................................................................... 15

      E.    District Court Proceedings ................................................................ 16

SUMMARY OF ARGUMENT........................................................................ 20

STANDARD OF REVIEW ............................................................................. 23

ARGUMENT .................................................................................................. 23

The AO Code's Restrictions on Partisan Political Activity  Are Consistent
with the First Amendment............................................................................. 23

      A.    The Constitutionality of the Restrictions at Issue Rests on a
           Balance Between the Employees' Interests and the
           Government's Reasonable Predictions of Harm ............................... 25

1.    Restrictions on Political Activity by Government
      Employees Are Subject to a Balancing of Interests ................. 25

2.    The Government Need Not Provide Documentary
      Evidence of Past Harm ............................................................ 28

B.   The Restrictions at Issue are Necessary to Protect the Perceived
     Independence of the Judicial Branch and the AO ............................. 33

1.    Increasing partisan polarization magnifies the threats to
      the perceived integrity of the Judicial Branch ......................... 33

2.    Unrestricted partisan political activity threatens the
      perceived integrity of the AO and the rest of the Judicial
      Branch .................................................................................... 41

3.    The restrictions at issue target activities that threaten
      harm to the perceived integrity of the Judicial Branch and
      the AO .................................................................................... 47

      a.    Contributing funds to a political party, political
            action committee, or partisan candidate. ...................... 47

      b.    Being a member of a partisan organization;
            attending a party convention, rally, or meeting;
            attending an event for a partisan candidate;
            attending a partisan fundraiser. ..................................... 49

      c.    Expressing opinions publicly regarding a political
            party or partisan candidate. ........................................... 50

      d.    Wearing or displaying partisan badges, signs, or
            buttons. ........................................................................... 51

4.    The District Court erred in dismissing the government's
      concerns ................................................................................. 53

C.   The Sweep of the Challenged Restrictions is Reasonably
     Necessary to Protect the Perception of Judicial Integrity ................. 56

CONCLUSION ................................................................................................ 59

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia,*
846 F.3d 391 (D.C. Cir. 2017) ............................................................... 30

*Baumann v. District of Columbia,*
795 F.3d 209 (D.C. Cir. 2015) ................................................... 26, 29, 55

*Blount v. SEC,*
61 F.3d 938 (D.C. Cir. 1995) .................................................................. 32

*Caperton v. A.T. Massey Coal Co.,*
556 U.S. 868 (2009) ...................................................... 21, 24, 28

*Chandler v. Judicial Council of the Tenth Circuit of the U.S.,*
398 U.S. 74 (1970) ....................................................................................6

*Connick v. Myers,*
461 U.S. 138 (1983) ................................................................ 29, 55

*Curtis, Ex parte,*
106 U.S. 371 (1882) ................................................................................ 25

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ............................................................................... 26

*Gilvin v. Fire,*
259 F.3d 749 (D.C. Cir. 2001 ................................................................. 23

*Janus v. American Fed'n of State, Cty., & Mun. Emps.,*
138 S. Ct. 2448 (2018) ........................................................................... 27

*Lalowski v. City of Des Plaines,*
789 F.3d 784 (7th Cir. 2015) .................................................................. 29

*Lane v. Franks,*
573 U.S. 228 (2014) ............................................................................... 26

\* Authorities upon which we chiefly rely are marked with asterisks.

*Nixon v. Shrink Mo. Gov't PAC*,
  528 U.S. 377 (2000) ........................................................................30

*Pickering v. Board of Educ.*,
  391 U.S. 563 (1968) ..................................... 17, 18, 21, 26, 27, 28, 30

*Sanjour v. EPA*,
  56 F.3d 85 (D.C. Cir. 1995) ........................................................ 27, 31

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ..................................................................... 25, 27

*United Public Workers of Am. v. Mitchell*,
  330 U.S. 75 (1947) ....................................................................... 20, 25

* *United States v. National Treasury Emps. Union*,
  513 U.S. 454 (1995) ........................................... 17, 18, 25, 26, 27, 30, 31, 32, 56

*United States v. Wurzbach*,
  280 U.S. 396 (1930) ........................................................................25

*U.S. Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL-CIO*,
  413 U.S. 548 (1973) ..................................................................... 20, 25

*Wagner v. FEC*,
  793 F.3d 1 (D.C. Cir. 2015) ............................................................30

* *Weaver v. U.S. Info. Agency*,
  87 F.3d 1429 (D.C. Cir. 1996) .............................. 19, 25, 27, 30, 32, 56

* *Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ..................................... 17, 18, 21, 23, 28, 29, 30, 31, 32, 58

**Statutes:**

Act of Mar. 3, 1849, ch. 108, § 4, 9 Stat. 395, 395 ....................................................4

Act of June 22, 1870, ch. 150, §15, 16 Stat. 162, 164 ...............................................5

* Authorities upon which we chiefly rely are marked with asterisks.

Administrative Office Act of 1939,
  Pub. L. No. 76-299, 53 Stat. 1223 .................................................................5

Pub. L. No. 67-298, 42 Stat. 837, 838 (1922)
  (codified at 28 U.S.C. § 331 *et seq.*) ....................................................5

28 U.S.C. § 331 ............................................................................................5

5 U.S.C. § 7323(b)(2)(A) ...........................................................................20

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................2

**Legislative Material:**

H.R. Rep. No. 76-702 (1939) ........................................................................6

**Other Authorities:**

Megan Brenan, *Trust in U.S. Legislative Branch 40%, Highest
  in Nine Years*, Gallup News (Oct. 1, 2018),
  https://news.gallup.com/poll/243293/trust-legislative-branch-
  highest-nine-years.aspx ..........................................................................34

Philip Bump, *What campaign contributions tell us about the
  partisanship of government employees*, Wash. Post
  (Dec. 27, 2018), https://www.washingtonpost.com/politics/
  2018/12/27/is-trumps-dismissal-unpaid-government-
  employees-democrats-accurate/ .............................................................48

Howie Carr, *Mueller stumbles, forgets, passes on that question*,
  Boston Herald, https://www.bostonherald.com/2019/07/24/
  howie-carr-mueller-stumbles-forgets-passes-on-that-question/ ...........39

Joaquin Castro (@Castro4Congress), Twitter (Aug. 5, 2019, 11:13 p.m.),
  https://twitter.com/Castro4Congress/status/1158576680182718464?s=20 .........48

Editorial, *Judicial Political Mischief*,
  Wall Street Journal, Jan. 21, 2020 .........................................................36

\* Authorities upon which we chiefly rely are marked with asterisks.

Editorial, *More Judicial Political Mischief*,
  Wall Street Journal, Jan. 23, 2020 .................................................................36, 54

Federal Election Comm'n, *Campaign Finance Data*,
  https://www.fec.gov/data/ (last visited Nov. 17, 2020) ........................................49

Gallup, *In Depth: Topics A to Z: Trust in Government*,
  https://news.gallup.com/poll/5392/trustgovernment.aspx
  (last visited Nov. 17, 2020)...................................................................................33

Michael Goodwin, *Mueller's testimony equals end of any
  Trump impeachment talk*, N.Y. Post (July 24, 2019),
  https://nypost.com/2019/07/24/muellers-testimony-
  equals-end-of-any-trump-impeachment-talk/.......................................................39

Gina Harkins, *After "MAGA" Patches, McCain Scandal, Navy
  Issues New Memo on Political Activities*, Military.com (June 26, 2019),
  https://www.military.com/daily-news/2019/06/26/after-maga-patches-
  mccain-scandal-navy-issues-new-memo-political-activities.html ......................51

Sounman Hong, *Political polarization on twitter: Implications
  for the use of social media in digital governments*,
  33 Gov't Info. Q. 777 (2016)................................................................................35

Jeffrey M. Jones et al., *Polling Matters: How Americans
  Perceive Government in 2017*, Gallup News (Nov. 1, 2017),
  https://news.gallup.com/opinion/polling-matters/221171/
  americans-perceive-government-2017.aspx) ......................................................34

Rebecca Leber, *A Republican Firm Is Targeting EPA Staff
  Who Have Donated to Democrats*, Mother Jones (Aug. 21, 2019),
  https://www.motherjones.com/politics/2019/08/a-republican-
  firm-is-targeting-epa-staff-who-have-donated-to-democrats/ ............................41

Letter from Rep. Jim Jordan to Sheryl Walter (May 18, 2020),
  https://republicans-judiciary.house.gov/wp-content/uploads/
  2020/05/2020-05-18-JDJ-to-Judicial-Conference-re-Draft-
  Advisory-Opinion.pdf ........................................................................................37

\* Authorities upon which we chiefly rely are marked with asterisks.

Michael J. Nelson & James L. Gibson, *Has Trump Trumped the Courts?*, NYU L. Rev. Online Symposium 32 (April 2018) ........................35

Suzanne Spaulding & Harvey Rishikof, *How Putin Works to Weaken Faith in the Rule of Law and Our Justice System*, Lawfare (Sept. 17, 2018), https://www.lawfareblog.com/ how-putin-works-weaken-faith-rule-law-and-our-justice-system ......................39

The Federalist No. 78 (A. Hamilton) (C. Rossiter ed. 1961)...............................4, 24

Transcript of Robert S. Mueller III's testimony before the House Judiciary Committee, Wash. Post (July 24, 2019), https://www.washingtonpost.com/politics/transcript-of-robert-s-mueller-iiis-testimony-before-the-house-judiciary-committee/2019/07/24/7164abfe-ad96-11e9-a0c9-6d2d7818f3da_story.html.........................................................................37, 38, 49

U.S. Courts:

    *Guide to Judiciary Policy*, vol. 2, pt. A, ch. 3 (effective Mar. 12, 2019), https://go.usa.gov/x7maz ......................................12
        § 320, Canon 5(A) ....................................................................13
        § 320, Canon 5(B) ....................................................................13

    *Guide to Judiciary Policy*, vol. 2, pt. B, ch. 2 (Oct. 15, 2019), https://go.usa.gov/x7mrb ......................................13

    *Proposed Changes to Code of Conduct for U.S. Judges and Judicial Conduct and Disability Rules*, https://go.usa.gov/x7mkT (last visited Nov. 17, 2020) ...................................11

John W. Winkle III, *Interbranch Politics: The Administrative Office of U.S. Courts as Liaison*, 24 Just. Sys. J. 43, 55 (2003) .............................................................................10

Harlington Wood, Jr., *Judiciary Reform: Recent Improvements in Federal Judicial Administration*, 44 Am. U. L. Rev. 1557, 1562 (1995)...................................................................5

\* Authorities upon which we chiefly rely are marked with asterisks.

Markus B. Zimmer, *Judicial System Institutional Frameworks:*
   *An Overview of the Interplay Between Self-Governance and*
   *Independence*,
   2011 Utah L. Rev. 121, 127 (2011)........................................................................5

\* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| AO | Administrative Office of the United States Courts |
| JA | Joint Appendix |

# INTRODUCTION

The district court invalidated seven restrictions in the Code of Conduct for judicial employees in the Administrative Office of the United States Courts (AO Code) on the ground that they violate the First Amendment. The invalidated restrictions prohibit employees from participating in certain partisan political activities. These common-sense restrictions—which have long been included in the Code of Conduct for Judicial Employees who work in courthouses (Courthouse Code)—further the compelling government interest in protecting the judiciary's reputation for impartiality and freedom from political influence. The district court's decision threatens that interest and should be reversed.

In 2018, the AO conformed the AO Code's rules regarding partisan political activity to those the Judicial Conference of the United States established for courthouse employees. After all, AO employees often perform functions similar to or more publicly visible than courthouse employees. The need to protect the Judicial Branch's hard-earned reputation for integrity and impartiality is thus no less important for judicial employees in the AO than for judicial employees in courthouses.

Recent events illustrate why such protection is necessary. During contemporary political conflicts, media entities, third-party groups, and even government officials often allege that government institutions are behaving in a

partisan manner.  To support such arguments, these groups often search for evidence that government employees have participated in partisan political activities on behalf of one side or another; this evidence is then cited to show that the government's actions were driven by partisan considerations.

The Judicial Branch, which controls neither purse nor sword, is particularly vulnerable to such allegations because, unlike the political branches, its legitimacy depends on its reputation for impartiality.  Permitting unrestricted partisan political activity by AO employees would supply further fuel for such allegations.  For example, media commentators recently alleged that political considerations motivated a draft advisory opinion prepared by a Judicial Conference committee with extensive AO support.  A member of Congress subsequently sought materials from the AO regarding the preparation of that opinion.  If the AO employees who worked on the draft opinion were known to have engaged in partisan political activities, those activities could easily be used to support allegations of partisanship and impugn the integrity of the Judiciary.  Restricting the partisan political activity of AO employees in the same manner as courthouse employees is a reasonable and constitutionally permissible response to these threats.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  JA 10, ¶ 5.  The district court entered final judgment for

2

plaintiffs on April 29, 2020.  JA 186.  The government timely filed a notice of

appeal on June 26, 2020.  JA 234.  Plaintiffs timely filed a notice of cross-appeal

on July 9, 2020.  JA 236.  This Court has appellate jurisdiction pursuant to 28

U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The Code of Conduct for Judicial Employees who work in federal

courthouses, which was adopted by Judicial Conference of the United States, has

long prohibited many partisan political activities.  In 2018, the AO updated the

Code of Conduct for AO employees—which had not been updated to the same

extent as the Courthouse Code and lacked some of these restrictions—to conform

to the Courthouse Code's restrictions on partisan political activity.  The question

presented is whether the enjoined restrictions in the AO Code, which are now

identical to those in the Courthouse Code, are consistent with the First

Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this

brief.

## STATEMENT OF THE CASE

### A.    The AO's Role in Protecting the Independence of the Judicial Branch

1.    Because "[t]he judiciary . . . has no influence over either the sword or the purse," its authority rests on its perceived legitimacy.  The Federalist No. 78, at 464 (Alexander Hamilton) (Clinton Rossiter ed. 1961).  That legitimacy in turn requires both actual and perceived independence from the partisan politics that characterize the elected branches.  As Hamilton explained, "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution."  The Federalist No. 78, at 465.   Hamilton further recognized, however, that the "the judiciary . . . is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches."  *Id.*  Such influence would arise, for example, "from a dependence of the [Judicial Branch] on the [elected branches], notwithstanding a nominal and apparent separation."  *Id.*  As a result, "all possible care is requisite to enable [the Judicial Branch] to defend itself against" influence by the other branches.  *Id.* at 464.

The Administrative Office of the United States Courts was created in significant part to insulate the Judicial Branch from such influence.  Until 1939, the federal Judiciary relied on the Executive Branch to serve its budgeting, personnel, and operational needs.  *See* Act of Mar. 3, 1849, ch. 108, § 4, 9 Stat. 395, 395 (shifting responsibility from Treasury Department to Department of the Interior);

4

Act of June 22, 1870, ch. 150, §15, 16 Stat. 162, 164 (shifting responsibility to Department of Justice).  The Executive Branch's "sometimes heavy-handed oversight and control" lead to "growing resistance [and], eventually, initiatives for . . . the incremental transfer of governance authority from executive departments to the judicial system."  Markus B. Zimmer, *Judicial System Institutional Frameworks: An Overview of the Interplay Between Self-Governance and Independence*, 2011 Utah L. Rev. 121, 127 (2011).

In 1922, Congress created the Conference of Senior Circuit Judges—now the Judicial Conference—to permit greater judicial self-governance and policymaking.  *See* Pub. L. No. 67-298, 42 Stat. 837, 838 (1922) (codified as amended at 28 U.S.C. § 331 *et seq.*).  Among other responsibilities, the Conference was to study and make recommendations for improving the operation of the courts. 28 U.S.C. § 331.  However, the Department of Justice retained responsibility for operational management of the Judiciary.

In 1939, Congress created the AO as a more substantial bulwark against political influence.  *See* Administrative Office Act of 1939, Pub. L. No. 76-299, 53 Stat. 1223; Harlington Wood, Jr., *Judiciary Reform: Recent Improvements in Federal Judicial Administration*, 44 Am. U. L. Rev. 1557, 1562 (1995).  The AO was charged with responsibility for supporting the Judicial Conference in its policymaking functions and for the administration of the Judiciary.

The House Report explained that "[u]nder the present system, an attorney general wishing to do so could interfere with the freedom of the courts."  H.R. Rep. No. 76-702, at 3 (1939).  The Act remedied this situation by providing "definite separation of the judicial branch . . . from fiscal and administrative control by the executive branch."  *Id.*  The AO would be free from political influence as "an arm of the judicial branch of government . . . under the direct control of the Supreme Court and the Judicial Conference of the United States."  *Chandler v. Judicial Council of the Tenth Circuit of the U.S.*, 398 U.S. 74, 97, 102 (1970) (Harlan, J., concurring).

2.    Today, the AO has over 1,100 employees, most of whom work in the Thurgood Marshall Federal Judiciary Building adjacent to Capitol Hill in Washington, D.C.  JA 131-32, ¶ 7.  The AO continues to perform a broad set of responsibilities on behalf of the Judicial Branch, most of which can be placed in three categories.

a.    First, the AO supports the policymaking and other functions of the Judicial Conference and its many committees, working groups, and advisory councils.  JA 132-34, ¶¶ 9-10.  The Judicial Conference, working closely with the AO, makes national policy for the Judiciary on subjects including court rules, probation and pretrial services, defender services, budgets, information technology, personnel, facilities, courthouse and judicial security, and judicial salaries and

6

benefits.  JA 132-33, ¶ 9.  For example, the Conference can make recommendations to amend certain provisions of the Federal Rules of Civil Procedure, determine where and how many new judgeships are needed, and establish codes of conduct for judges and judicial employees.

The AO's Director is appointed by the Chief Justice of the United States and serves as the Secretary of the Conference.  JA 132, ¶¶ 8-9.  In that capacity, the Director supervises and coordinates the Conference's policymaking efforts and the AO staff who support those efforts.  JA 133-34, ¶ 10.  Employees from nearly every office and department in the AO support these functions.  Among other tasks, these employees draft proposed legislation, improve the courts' case management processes, develop and prioritize budget needs, and provide recommendations on policy issues that, if approved, become the official policy of the Branch.  JA 133-34, ¶¶ 10-11.

For example, AO employees in the Department of Administrative Services work with judges on the Committee on Judicial Resources to carry out the difficult and sensitive task of determining how many new judgeships are needed, and in which courts.  JA 156, ¶ 5.  AO staff in the Office of the General Counsel recently helped draft changes to the Code of Conduct for U.S. Judges as well as the Judicial Conduct and Disability Rules, which establish mechanisms for filing a complaint

of judicial misconduct or disability against a federal judge.  Those changes were approved by the Conference in March 2019.  JA 133, ¶ 10.

AO employees may soon be called on to assist the Conference in addressing whether to impose geographic limits on preliminary injunctions that would otherwise be national in scope.  JA 144-45, ¶ 26.  If taken up by a Committee or the full Conference, the AO's work could result in changes to the Federal Rules of Civil Procedure or legislation in Congress.  The Conference has previously approved many policies proposed by AO employees that broadly affect how litigants and the public interact with the Judicial Branch—for example, policies regarding courtroom cameras, pro se litigant access, and PACER access.  JA 133-34, ¶ 10.

Supporting the Conference requires extensive collaboration and communication between AO employees and the more than 250 federal judges who sit on the Conference's committees. Additionally, over 100 federal judges serve on advisory councils that assist the AO in drafting policy recommendations.  JA 132, ¶ 9.  Judges oversee and work closely with AO employees who staff committees, and make recommendations about the hiring, promotion, and assignment of AO staff.  JA 134, ¶ 11; JA 137, ¶ 13.

b.    Second, the AO represents the Judicial Branch before the elected branches and the public.  Some of the Judiciary's most critical work is carried out

by AO employees who represent the Branch before Congress. Employees in the AO's Office of Legislative Affairs advocate before Congress on behalf of the Judiciary on issues as new judgeships, judicial ethics, courthouse construction, and the structure of the circuits. JA 138, ¶ 14(d). In the 115th Congress, for example, these employees were involved in numerous bills affecting the Judiciary, as well as annual budget requests and the creation of new judgeships. In addition to these employees' regular interactions with Congress, subject matter experts from other AO offices are commonly called upon to present information, formally or informally, to Congress. JA 137-39, ¶ 14; JA 141, ¶ 20.

The AO Director also testifies before Congress on behalf of the Judiciary, including when it makes its annual budget request. JA 138, ¶ 14(d). To support those requests, AO employees in the Department of Administrative Services engage in frequent communication with members and staff of the Senate and House Appropriations Committees. These AO employees prepare the detailed budget requests and underlying data, respond to inquiries from Congress, and sometimes provide detailed briefings to members and staff together with subject matter experts from elsewhere in the AO. JA 155-56, ¶ 4.

As explained in the declarations of Manus Cooney and Ronald Weich—a former Chief Counsel to the Senate Judiciary Committee and a former Chief Counsel to Senator Edward M. Kennedy on the Senate Judiciary Committee—

Congress understands that the AO and its employees speak for the Judicial Branch as a whole.  JA 139, ¶ 15; JA 173, ¶ 4; JA 175, ¶ 9; JA 162-63, ¶ 6; JA 164, ¶ 9. Thus, if a member of Congress seeks input from the AO on the wisdom of particular policies or about the partisan impacts of legislation, AO employees will limit their comments to addressing only its effects on the administration of justice. JA 175-76, ¶ 10; JA 164-65, ¶¶ 9-10.  In their interactions with Congress, AO employees decline to express positions on legislation or issues on which the Conference has not itself reached a view.  JA 163, ¶ 7; JA 175-76, ¶ 10.

AO employees also interact regularly with a number of executive agencies— including the Office of Management and Budget, the U.S. Marshals Service, the General Services Administration, the Federal Protective Service, and the Executive Office for United States Attorneys.  JA 174-75, ¶ 8; JA 157, ¶ 6.  For example, the General Services Administration maintains responsibility for assessing the Judicial Branch's space needs and for the construction of new courthouses and offices. John W. Winkle III, *Interbranch Politics: The Administrative Office of U.S. Courts as Liaison*, 24 Just. Sys. J. 43, 55 (2003).  Similarly, the Judiciary's budget "requests must be channeled through the President's budget."  *Id.*  AO employees also regularly interact with the Department of Justice on proposals concerning, for example, the federal hate crimes statute and other criminal justice issues.  JA 174-75, ¶ 8.

The AO's Office of Public Affairs serves as the Judicial Branch's primary point of contact for the news media.  JA 138, ¶ 14(b).  Whenever a reporter seeks comment about a judicial decision or other developments in the lower courts, that reporter's first contact is typically with an AO employee.  *Id.*  In addition, the Conference holds public, televised hearings on proposed policy changes and changes to the Federal Rules, which are staffed by AO employees from multiple different AO components.  JA 137-38, ¶ 14(a); *see, e.g.*, U.S. Courts, *Proposed Changes to Code of Conduct for U.S. Judges and Judicial Conduct and Disability Rules*, https://go.usa.gov/x7mkT (last visited Nov. 17, 2020).

c.      Third, the AO provides a variety of legal, financial, statistical, technological, and other services to the Judiciary.  JA 131, ¶ 6.  One component of this mission entails advising judges on a wide range of topics.  For example, the Office of the General Counsel provides legal and ethical counsel to judges and court staff on issues including disqualification or recusal from pending cases, judicial administration, participation in outside activities, and gifts or travel reimbursement from outside organizations.  JA 136-37, ¶ 12(a)-(b).  Similarly, the Department of Program Services/Judicial Services Office provides subject matter expertise on legal, policy, administrative, and operational matters affecting judges and their staffs.  The office responds to inquiries from judges and their staffs about such topics as bankruptcy, the authority of magistrate judges, court governance,

11

chief judges' authority, residency requirements, travel, and visiting judge assignments.  *Id.*  Other AO employees perform administrative tasks similar or identical to those performed by employees who work in courthouses across the nation—for example, providing information technology or human resources support.  JA 131, ¶ 6.

### B.    Restrictions on Partisan Political Activity in the Code of Conduct for Judicial Employees

The Judicial Branch has long protected itself against actual or perceived entanglement with partisan politics through the Code of Conduct for Judicial Employees (Courthouse Code), which restricts the political activities of judicial employees who work in federal courthouses.   *See* U.S. Courts, *Guide to Judiciary Policy*, vol. 2, pt. A, ch. 3 (effective Mar. 12, 2019) (Courthouse Code), https://go.usa.gov/x7maz.  The Courthouse Code was initially drafted by the 15 federal judges on the Judicial Conference's Committee on Codes of Conduct. JA 140, ¶ 17.  The Judicial Conference—which is composed of 26 federal judges, including the Chief Judges of every circuit court of appeals, with the Chief Justice of the United States presiding—approved the Courthouse Code in 1995, as well as subsequent updates.  *Id.*

The Courthouse Code imposes two levels of restrictions, both of which are more extensive than those that apply to most Executive Branch employees under the Hatch Act.  First, the Code requires all courthouse employees—regardless of

their connection to decisionmaking in individual cases—to "refrain from partisan political activity." Courthouse Code § 320, Canon 5(A). This restriction prohibits, for example, raising funds or contributing to partisan political organizations and candidates; publicly endorsing or opposing a partisan political organization or candidate; and displaying campaign signs and buttons for a partisan political candidate or organization. *Id.*; *see also see also* U.S. Courts, *Guide to Judiciary Policy*, vol. 2, pt. B, ch. 2 (Oct. 15, 2019), https://go.usa.gov/x7mrb (published advisory opinions). Second, the Code imposes heightened restrictions on judges' personal staff, staff attorneys, court executives, and certain other employees, who must also refrain from nonpartisan political activity. Courthouse Code § 320, Canon 5(B).

### C.     The AO Code of Conduct

Whereas judicial employees working in courthouses are governed by the Courthouse Code, judicial employees working in the AO are governed by the AO Code of Conduct. Prior to the updates at issue in this case, the AO Code restricted some but not all of the partisan political activity prohibited by the Courthouse Code. JA 140, ¶ 16. AO employees were therefore free to engage in partisan political activities that were prohibited for their courthouse counterparts. For example, the prior AO Code permitted employees to be a poll watcher or challenger for a partisan candidate; display campaign signs and buttons; and attend

fundraisers and contribute to partisan candidates or groups.  JA 54-56.  The prior

Code further permitted employees to manage political campaigns, drive voters to

the polls, and hold office in partisan political groups at the state or local levels, but

not at the federal level.  *Id.*

In 2015, the Director of the AO began the process of updating the AO Code

to conform to the more recent Courthouse Code.  JA 140, ¶ 16; JA 141-42, ¶ 21.

The revised AO Code, which took effect March 1, 2018, adopts the same

restrictions on political activity as the Courthouse Code.  JA 141-42, ¶ 21.  For

almost all AO employees, the AO Code prohibits many forms of partisan political

activity while permitting nonpartisan political engagement that is otherwise

consistent with the Code.  *Id.*  That approach is consistent with the Courthouse

Code's restrictions on most courthouse employees.  Only six senior AO

employees—the Director, the Deputy Director, the three Assistant Directors, and

the General Counsel—are also restricted from participating in nonpartisan political

activity; that restriction matches those governing judges' personal staff and certain

other courthouse employees.  *Id.*

In revising the AO Code, the Director sought to preserve the perception—by

both the general public and their representatives in the elected branches—of the

entire Judiciary as an independent, apolitical branch of government, and judges'

own perceptions of the AO as an apolitical entity dedicated to nonpartisan advice

14

and administration.  JA 143, ¶ 23.  The Director also explained that harmonizing the codes would help unify the AO's work with that of the rest of the Judiciary.  JA 142-43, ¶ 22; *see* JA 37-38.  In conjunction with the revised Code, the AO issued detailed guidance listing examples of permissible and impermissible activities. JA 54-56.

### D.    Plaintiffs' Complaint

Plaintiff Lisa Guffey is an attorney in the AO who says she "assess[es] whether federal defender offices and court panel attorney programs across the country are properly resourced, operating effectively, and complying with relevant administrative policies and procedures."  JA 30, ¶ 2.  She also "provide[s] regular support, advice, and training to federal defender offices."  *Id.*  In her role, Guffey "interact[s] with Article III judges approximately 5-8 times per year" and "report[s] to the chair and members of the Judicial Conference Committee on Defender Services . . . on an ad hoc basis."  JA 30-31, ¶ 3.

Plaintiff Christine Smith is an employee in the AO whose responsibilities at the time of the complaint included "mak[ing] sure that the IT needs of federal public and community defenders are heard, addressed, and budgeted for" and "mak[ing] policy recommendations to a committee of Article III judges regarding cybersecurity."  JA 25, ¶ 2.[1]

---

[1] Plaintiff Smith is now employed in a different position within the AO.

Plaintiffs filed suit in May 2018 to challenge nine specific restrictions under the revised AO Code.  JA 14-15, ¶ 21.  The challenged restrictions prohibit:

a.  expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office;

b. wearing or displaying partisan political badges, signs, or buttons;

c. driving voters to polls on behalf of a political party or partisan candidate for office;

d. contributing funds to a political party, political action committee, or partisan candidate for office;

e. attending partisan fundraisers;

f. being a member of a partisan political organization (other than registering as a member of a party for voting purposes);

g. attending events for a partisan candidate for office;

h. organizing events for a partisan candidate for office; and

i. attending party conventions, rallies, or meetings.

*Id.*  Plaintiffs argued that the restrictions violated their freedom of speech under the First Amendment and that the term "partisan political activity" is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.  JA 21, ¶¶ 50, 51.

### E.    District Court Proceedings

1.    The district court entered a preliminary injunction enjoining seven of the challenged restrictions.  JA 114-15.  The court denied a preliminary injunction,

however, with respect to two restrictions—on organizing partisan events and driving voters to the polls on behalf of a party or candidate.  JA 106.

2.    The district court subsequently granted summary judgment for plaintiffs with respect to the seven restrictions it previously enjoined.[2]  The court entered summary judgment for the government as to the remaining two restrictions.  JA 186.

The court applied the balancing test from *Pickering v. Board of Education*, 391 U.S. 563 (1968), which governs restrictions on government employees' speech as citizens on matters of public concern, as clarified by *United States v. National Treasury Employees Union*, 513 U.S. 454, 465 (1995) (*NTEU*).  JA 205-207.  In conducting this balancing, the Court recognized that, under *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), the government's interest in preserving the appearance of judicial integrity and impartiality is "genuine and compelling."

---

[2] The seven enjoined restrictions are:
a. expressing opinions publicly regarding a political party or partisan candidate for office;
b. wearing or displaying partisan political badges, signs, or buttons;
c. contributing funds to a political party, political action committee, or partisan candidate for office;
d. attending partisan fundraisers;
e. being a member of a partisan political organization;
f. attending events for a partisan candidate for office; and
g. attending party conventions, rallies, or meetings.
JA 186-87.

JA 210 (quoting *Williams-Yulee*, 575 U.S. at 446).  The court further explained that, in light of *Williams-Yulee*'s recognition that "[t]he concept of public trust in judicial impartiality does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," 575 U.S. at 447, "the government was due 'more deference' in its 'predictions of harm here than would be proper if the government had asserted a different interest,'" JA 210 (quoting JA 105).

Synthesizing *Pickering*, *NTEU*, and *Williams-Yulee*, the court concluded that "the government could carry its burden by relying on 'realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially.'"  JA 211 (quoting JA 105).  The court declined to extend this principle, however, to all aspects of this government interest.  The court held that this "relaxed burden" would apply to the extent the government sought to protect the general public's perception of judicial integrity. JA 211.  However, to the extent the government sought to address the elected branches' perceptions of judicial integrity, or federal judges' perceptions of the AO's impartiality, the court would require the government to "point to documentary evidence showing that employees' activities have eroded" the relevant audience's "confidence in the past and will continue to do so if left unrestricted."  JA 210.

Yet even with respect to the general public's perception of judicial integrity, the district court rejected the government's proffered hypotheticals as insufficiently realistic to meet its standard. JA 221. The court reasoned that an unlikely chain of events would have to occur for the public to infer that the restricted activities would impact decisions in individual cases. JA 220-21. The court further held that the government had not established that the regulation's sweep is "'reasonably necessary to protect the efficiency of the public service.'" JA 222 (quoting *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996)). The court reasoned that the government had not explained why lesser restrictions were insufficient to prevent the feared harm, and that the restrictions were also underinclusive. JA 222-24.

With respect to perceptions by the elected branches and by federal judges, the court held that the government failed to produce sufficient evidence that the restricted activities had in fact harmed these interests. JA 226, 229.

The district court therefore permanently enjoined enforcement of seven restrictions with respect to all AO employees, other than the six senior officials subject to heightened restrictions. JA 233. However, the court held that two restrictions—those not covered by the preliminary injunction—did not violate the First Amendment. The court explained that the restricted activities—driving voters to polls on behalf of a political party or partisan candidate, and organizing events

for a partisan candidate—"evince particularly strong commitments to enlisting partisan support." JA 225. The court further noted that the Supreme Court has twice upheld the Hatch Act's prohibition on "tak[ing] an active part in political management or political campaigns," which has been construed to prohibit the same activities. *See* JA 224 (quoting 5 U.S.C. § 7323(b)(2)(A) (alteration in original)); *see U.S. Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973); *United Public Workers of Am. v. Mitchell*, 330 U.S. 75, 103-04 (1947).[3] The court reasoned that "the Supreme Court's longstanding approval of these kinds of restrictions, even as applied to low-level executive-branch employees, strongly supports their legality—particularly when coupled with the deference afforded to the government in seeking to protect the judiciary's reputation for impartiality." JA 224-25.

## SUMMARY OF ARGUMENT

To protect the Judicial Branch's reputation for political impartiality and independence, the AO requires its employees to abide by the same limitations on partisan political activities that the Judicial Conference imposes on employees who

---

[3] The Supreme Court upheld those restrictions when they applied to all Executive Branch employees. *Letter Carriers*, 413 U.S. at 550; *Mitchell*, 330 U.S. at 78. Today, those restrictions apply only to a subset of such employees. 5 U.S.C. § 7323(b)(2)(A).

work in federal courthouses.  The district court held that most of those limitations

violate the First Amendment.  That holding is incorrect.

Because this case concerns restriction on government employees' speech as

citizens on matters of public concern, *Pickering v. Board of Education*, 391 U.S.

563 (1968), requires this Court to balance the government's interest in regulating

First Amendment activity against AO employees' interest in engaging in that

activity.  The government must demonstrate that the harms it seeks to address are

real, that the restrictions at issue will meaningfully address those harms, and that

the sweep of the restrictions is necessary to protect the efficiency of the public

service.

The government need not, however, provide documentary proof that the

feared harms have already occurred.  Protecting the Judicial Branch's reputation

for impartiality and integrity is an undisputedly compelling government interest,

but that interest "does not easily reduce to precise definition, nor does it lend itself

to proof by documentary record."  *Williams-Yulee v. Florida Bar Ass'n*, 575 U.S.

446, 447 (2015) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889

(2009)).  Moreover, the government need not allow harm to occur before it takes

action.

The restrictions at issue are necessary to protect the legitimacy of the

Judicial Branch, which depends on its reputation for nonpartisanship and freedom

21

from political influence. Public confidence in government institutions is declining due to increased partisan polarization, a phenomenon often accelerated by social media. Unrestricted partisan political activity by AO employees would provide fuel for allegations of partisanship by the Judicial Branch.

This threat is not hypothetical. Recent controversy over a draft advisory opinion issued by a Judicial Conference committee, for example, has already led to allegations of judicial partisanship and scrutiny of the AO's role in preparing the opinion. Other recent events, such as the congressional response to Special Counsel Mueller's investigation, further illustrate how government employees' partisan political activities can become fodder for allegations that the government institutions they work for are driven by partisan considerations. Although partisan politics might be expected in the elected branches, such allegations are particularly damaging for the Judiciary because impartiality is the bedrock of its authority and legitimacy.

The AO reasonably determined that permitting unrestricted partisan political activity would threaten the perceived integrity of the AO and the Judicial Branch as a whole. In doing so, the AO considered the effects of the restricted activities on the perceptions of three audiences: the general public, the elected branches of government, and federal judges themselves. Each of the restrictions at issue

prohibits partisan political activity that, if unrestricted, would threaten serious harm to the perceived integrity of the Judicial Branch as a whole.

The sweep of the restrictions is also reasonably necessary to protect the efficiency of the public service. The district court suggested that the AO could punish partisan conduct that the AO finds inappropriate after the fact, rather than prohibit categories of partisan political activity prospectively. But recent experience demonstrates that even seemingly innocuous partisan conduct, such as legal campaign contributions and attendance at partisan events, are nonetheless cited as evidence of partisanship in government institutions. And if the AO were to punish an employee for partisan activity, the AO's discipline could itself be perceived as exhibiting partisanship in the opposite direction. The revised AO Code's restrictions are therefore necessary to protect the government's compelling interest in preserving the Judiciary's reputation for integrity and nonpartisanship.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001).

## ARGUMENT

### THE AO CODE'S RESTRICTIONS ON PARTISAN POLITICAL ACTIVITY ARE CONSISTENT WITH THE FIRST AMENDMENT

The Supreme Court held in *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), that the "public perception of judicial integrity is 'a state interest of the

23

highest order.'" *Id.* at 446 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)). The Court observed that "[u]nlike the executive or the legislature, the judiciary 'has no influence over either the sword or the purse; . . . neither force nor will but merely judgment.'" *Id.* at 445 (quoting The Federalist No. 78, at 465 (alterations in original)). As a result, "[t]he judiciary's authority . . . depends in large measure on the public's willingness to respect and follow its decisions." *Id.* at 445-446.

The Judiciary's legitimacy depends in particular on its perceived nonpartisanship and its independence from the political branches. As Hamilton recognized, "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution." The Federalist No. 78, at 465. Liberty "would have every thing to fear from its union with either of the other departments," Hamilton warned, and thus "all possible care is requisite to enable [the judiciary] to defend itself" against entanglement with the political branches. *Id.* at 464, 465.

This case requires the Court to balance the government's compelling interest in protecting the perception of judicial integrity against AO employees' undeniably significant interest in engaging in the restricted forms of partisan political activity. That balance favors the government. As explained below, unrestricted partisan political activity threatens harm to the Judiciary's reputation that is "real, not merely conjectural," and the restrictions in the AO Code "will in fact alleviate

these harms in a direct and material way." *United States v. National Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)).  Moreover, the "'regulation's sweep is reasonably necessary to protect the efficiency of the public service.'"  *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (quoting *NTEU*, 513 U.S. at 474). The restrictions at issue therefore pass constitutional muster.

### A.    The Constitutionality of the Restrictions at Issue Rests on a Balance Between the Employees' Interests and the Government's Reasonable Predictions of Harm

#### 1.    Restrictions on Political Activity by Government Employees Are Subject to a Balancing of Interests

As the Supreme Court has recognized, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."  *NTEU*, 513 U.S. at 465.  The Court has accordingly upheld restrictions on partisan political activity by government employees in cases stretching back over a century.  *See, e.g.*, *Ex parte Curtis*, 106 U.S. 371 (1882); *United States v. Wurzbach*, 280 U.S. 396 (1930).  In two cases—*U.S. Civil Service Commission v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973) and *United Public Workers of America v. Mitchell*, 330 U.S. 75 (1947)—the Court upheld restrictions on partisan political activity in the Hatch Act that apply to Executive Branch employees.

Supreme Court cases outside the political activity context provide further guidance in evaluating restrictions on government employee speech. *Pickering v. Board of Education*, 391 U.S. 563 (1968), "provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees." *Lane v. Franks*, 573 U.S. 228, 236 (2014). Under *Pickering*, a court must first ascertain whether the regulated speech is made by the employee "as a private citizen, addressing matters of public concern." *Baumann v. District of Columbia*, 795 F.3d 209, 215 (D.C. Cir. 2015); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If so, the court must balance (1) "the interests of the [employee], as a citizen, in commenting upon matters of public concern" and (2) "the interest of the [government], as an employer," in protecting the asserted interest. *Pickering*, 391 U.S. at 568.

The Supreme Court further refined this balancing test in *NTEU*, in which it struck down a statute that broadly prohibited nearly all Executive Branch employees from accepting honoraria for speeches or articles on any topic. 513 U.S. at 457. Because of the restriction's broad and prospective nature, the Court held that "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary

26

impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571). The Court explained that "mere speculation" is not enough; the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (quoting *Turner,* 512 U.S. at 664). The Court ultimately concluded that it was unreasonable for Congress to assume that accepting honoraria could create an appearance of improper influence among "all federal employees below grade GS-16, an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles." *Id.* at 473; *see also Janus v. American Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2472 (2018).

Finally, with regard to the scope of the restrictions, the government must show "the regulation's sweep is 'reasonably necessary to protect the efficiency of the public service.'" *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474). Notably, this standard does not require "that the government's interests absolutely necessitate the precise contours of the [restriction] in the case of each and every employee" subject to the restriction. *Id.* at 1443. The *Pickering*/*NTEU* standard does not impose the narrow tailoring or "least restrictive means" requirements found in some other First Amendment contexts. *See Sanjour v. EPA*, 56 F.3d 85, 98 (D.C. Cir. 1995) (en banc).

## 2.     The Government Need Not Provide Documentary Evidence of Past Harm

The district court held that, with respect to the Judiciary's perceived integrity before the elected branches, and judges' perceptions of the AO's impartiality, the government was required to provide documentary evidence of past harm.  To the contrary, the government was not required to prove past harm to support the prophylactic restrictions on partisan activities here.  In any event, as discussed further below, the government has cited evidence of attempts to cast doubt on the Judicial Branch's integrity based on perceived partisanship relating to the AO's role in judicial policymaking.  *See infra* pp. 36-37.

a.     Documentary evidence of past harm is unnecessary even under strict scrutiny, a more demanding level of scrutiny than that required by *Pickering*.  In *Williams-Yulee*, the Supreme Court upheld a state rule barring judicial candidates from personally soliciting campaign contributions.  The Court held that the rule was narrowly tailored to serve the compelling interest of "preserving public confidence in the integrity of the judiciary," 575 U.S. at 444, "'a state interest of the highest order,'" *id.* at 446 (quoting *Caperton*, 556 U.S. at 889).

In concluding that the state met its burden to establish the rule's constitutionality, the Court observed that "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record." *Williams-Yulee*, 575 U.S. at 447.  The Court

28

therefore did not require the state to produce documentary proof that personal solicitations had caused past harm.  Even without such evidence, the Court held that the state was not "require[d] . . . to tolerate these risks."  *Id.* at 448.

The Supreme Court's holding that documentary evidence of past harm was not required in *Williams-Yulee* is consistent with other First Amendment precedents.  The Court has never imposed a rigid requirement that the government prove past harm to justify a restriction on speech by government employees.  To the contrary, the government need not "'allow events to unfold to the extent that the disruption . . . is manifest before taking action.'"  *Baumann*, 795 F.3d at 217 (quoting *Connick v. Myers*, 461 U.S. 138, 152 (1983)) (alteration in original); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 791 (7th Cir. 2015) ("[A] showing of actual disruptiveness is not required; a government employer is allowed to consider the potential disruptiveness of the employee's speech." (quotation marks omitted)).

*Williams-Yulee* reflects a long-standing recognition that even in the First Amendment context, evidentiary demands should be tailored to the case at hand. This Court has explained, for example, that "studies, statistics or other empirical evidence" were not required in a First Amendment case where "[t]he justification for the rule's requirement . . . is just the sort of common-sense judgment for which empirical data is likely to be both unavailable and unnecessary."  *Act Now to Stop*

29

*War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 408 (D.C. Cir. 2017); *see also Weaver*, 87 F.3d at 1443. And this Court has not demanded documentary proof where such evidence is unlikely to be available. *See, e.g.*, *Wagner v. FEC*, 793 F.3d 1, 14 (D.C. Cir. 2015). That approach is consistent with the Supreme Court's more general rule that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).

The district court correctly recognized that, under *Williams-Yulee*, the government need not provide documentary proof of past harm to the general public's perception of judicial integrity. That conclusion follows directly from *Williams-Yulee*, which held that such proof was not required even under strict scrutiny, 575 U.S. at 447; the same result necessarily applies under the less demanding *Pickering*/*NTEU* standard. The district court therefore correctly concluded that the government may "rely[] on 'realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially.'" JA 211.

b.      The district court erred, however, in applying a more demanding burden to other aspects of the government's interest in protecting perceptions of judicial integrity. The court held that, to the extent the AO was concerned with the

perceptions of the elected branches, or the perceptions of judges, it must satisfy what the district court considered the government's "customary burden to 'point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted.'"  JA 210. The court required proof of past harm because it read *Williams-Yulee* as concerning only "the integrity of *judicial decision-making in individual cases*," and not "judicial branch administration and policymaking."  JA 212, 213.

But while *Williams-Yulee* did not discuss the judicial branch's relationship with Congress and the Executive Branch—it concerned state judicial elections— the underlying principles reflected in the Court's reasoning are equally applicable to all aspects of the government's interest.  As explained, neither the Supreme Court nor this Court have imposed a rigid requirement that the government produce documentary proof of past harm.

The district court appeared to believe that such a requirement sprung from *NTEU*'s statement that the harms the government seeks to address must be "real, not merely conjectural."  JA 196-97 (quoting *NTEU*, 513 U.S. at 468)); *see also Sanjour*, 56 F.3d at 98-99.  But as this Court has recognized, a lack of documentary proof of past harm does not mean that a harm is "merely conjectural."  This Court has found the "real, not merely conjectural" standard satisfied when the restricted activity "self-evidently create[s] . . . a risk that" the feared harm would occur, even

31

though "the record contains no evidence of specific instances of" those harms.

*Blount v. SEC*, 61 F.3d 938, 944-45 (D.C. Cir. 1995).  Applying the *NTEU*

standard, this Court similarly upheld a regulation requiring prepublication review

of employee speech based on general reasoning about the need to protect the

information at issue, without citing or requiring any documentary evidence of past

harm.  *See Weaver*, 87 F.3d at 1443.

Thus, even if *Williams-Yulee* does not directly address the standard of review

that applies to these aspects of the government's interest, the district court erred in

requiring the government to produce evidence that harm had already occurred.

Protecting perceptions of judicial integrity is an undeniably compelling interest,

but it is intrinsically difficult to gauge those perceptions and document the impact

of individual activities on them.  The government should not be required to

produce evidence that may not be readily available even if the harm is real.

Finally, there is no basis for subjecting the elected branches' perceptions of

judicial integrity to a more demanding standard of proof than that of the general

public.  Just as with the general public, the Judicial Branch depends on its

perceived nonpartisanship for its legitimacy and effectiveness before the other

branches.  Thus, for example, the Judicial Branch's ability to secure funding and

influence policies affecting the judiciary would be substantially diminished if it

was perceived as behaving in a partisan manner.  More generally, the perceptions

of the general public and the elected branches heavily overlap.  Congress and the

President serve as elected representatives of the public, and they both influence and

are influenced by public opinion.  For example, as discussed below, media

commentators and members of Congress have accused the judiciary of bias with

respect to a draft advisory opinion on judges' memberships in certain law-related

organizations.  *See infra* pp. 36-37.  The public nature of these attacks will tend to

cause members of the general public, especially those aligned with the party

making the attacks, to similarly question the impartiality of the Judicial Branch.  If

partisan activity by judicial employees causes other branches to question the

legitimacy of the Judicial Branch, or the branch to be drawn into political disputes

with other branches, that will diminish its legitimacy before general public as well.

## B. The Restrictions at Issue are Necessary to Protect the Perceived Independence of the Judicial Branch and the AO

### 1. Increasing partisan polarization magnifies the threats to the perceived integrity of the Judicial Branch

a.    Because of its perceived independence from political influence, public

confidence in the Judicial Branch has historically surpassed confidence in the

Legislative and Executive Branches.  *See* JA 148, ¶ 31.  For example, Gallup

reported that 68% of Americans had "a great deal" or "a fair amount" of trust in the

Judicial Branch in 2018 compared to 42% in the Executive Branch and 40% in the

Legislative Branch.  Gallup, *In Depth: Topics A to Z: Trust in Government*,

https://news.gallup.com/poll/5392/trustgovernment.aspx (last visited Nov. 17, 2020).

Recent societal trends, however, make it more likely that perceptions of partisanship will undermine the legitimacy of the Judicial Branch.  Public trust in all branches is declining on a long-term basis.  *See* JA 148, ¶ 31 (citing Jeffrey M. Jones et al., *Polling Matters: How Americans Perceive Government in 2017*, Gallup News (Nov. 1, 2017), https://news.gallup.com/opinion/polling-matters/221171/americans-perceive-government-2017.aspx).  Survey data further demonstrates that public confidence (or lack thereof) in the Judiciary is strongly linked to partisanship.  *See* JA 148, ¶ 31 (citing Megan Brenan, *Trust in U.S. Legislative Branch 40%, Highest in Nine Years*, Gallup News (Oct. 1, 2018), https://news.gallup.com/poll/243293/trust-legislative-branch-highest-nine-years.aspx).  Specifically, Gallup data shows that Americans express higher levels of public confidence in the judicial branch when the political party they favor controls the Executive Branch.[4]

---

[4] In 2000, at the end of the Clinton presidency, Democrats espoused more support for the courts than Republicans.  This ordering switched in 2001, and Republicans maintained more support through George W. Bush's presidency.  When Barack Obama took office in 2009, Democrats became more supportive.  In 2017, this ordering switched again.  *See* Brenan, *supra*, at figure entitled "Americans' Trust in U.S. Federal Government's Judicial Branch, by Party."

Significantly, swings in public confidence in the judiciary attributable to partisanship have been growing in magnitude.  When broken down by party affiliation, the shifts in confidence accompanying the inaugurations of President Obama and President Trump dwarfed those surrounding President Bush's inauguration.  This data suggests increasing partisan polarization even toward the comparatively well-trusted Judicial Branch.  Moreover, "research suggests that criticism on politicized grounds has been found to be especially harmful to courts' public support," and "individuals' perceptions of politicized courts are associated with a decrease in public support for courts."  Michael J. Nelson & James L. Gibson, *Has Trump Trumped the Courts?*, NYU L. Rev. Online Symposium 32, 36, 38 (April 2018).

The growth of social media has further magnified these trends.  Evidence suggests "that social media's capacity for information personalization may contribute to heightened levels of extremism—thus further increasing online political polarization."  Sounman Hong, *Political polarization on twitter: Implications for the use of social media in digital governments*, 33 Gov't Info. Q. 777 (2016).  Social media messages "containing extreme views may be more likely to be noticed, circulated, and amplified by the public, due to the 'echo chamber' nature of social media outlets."  *Id.*  Moreover, social media increases the speed with which partisan messages can be expressed, disseminated, and exploited.

Thus, partisan activity that may have escaped notice in the past is now more likely to be observed and disseminated.

b.     Recent experience demonstrates specific ways in which heightened partisan polarization can diminish the perceived legitimacy of the Judicial Branch. In particular, these events highlight how partisan political activity by government employees—even seemingly innocuous activity—can undermine the perceived legitimacy of the government institutions they work for, including the Judiciary.

i.     The Judicial Branch has often faced challenges to its legitimacy that are driven by perceptions of partisanship.  For example, the Judicial Conference's Codes of Conduct Committee recently issued a draft advisory opinion—with extensive support from the AO—regarding judges' memberships in certain law-related organizations.  Commentators in the media attacked the draft opinion as partisan.  One editorial called the draft "political mischief," citing the fact that a judge on the committee had donated (prior to joining the bench) to a Senator who had spoken out on the issue.  Editorial, *Judicial Political Mischief*, Wall Street Journal, Jan. 21, 2020, at A16.  A follow-up editorial asserted that the opinion was "dirty political business" that would "risk[] tarnishing the reputation of the judiciary as even-handed and nonpartisan."  Editorial, *More Judicial Political Mischief*, Wall Street Journal, Jan. 23, 2020, at A14.

Citing media reports, a member of Congress wrote to the AO, asserting that the "draft advisory opinion . . . raise[s] concerns about the biases and motivations of the opinion's drafters."  Letter from Rep. Jim Jordan to Sheryl Walter (May 18, 2020), https://republicans-judiciary.house.gov/wp-content/uploads/2020/05/2020-05-18-JDJ-to-Judicial-Conference-re-Draft-Advisory-Opinion.pdf.  Asserting that "questions remain about the basis for and origin of this opinion and its drafting process," the letter requested documents and information related to the opinion's preparation, including drafts, meeting minutes, notes, and information about the Committee's members.  *Id.*

Permitting AO employees to engage in unrestricted partisan political activity would provide ammunition for such allegations of partisanship in the Judiciary.  A well-known example from outside the judicial context illustrates the potential for such harm.  *See* JA 185, ¶ 6.  During Special Counsel Robert Mueller's testimony before the House Judiciary Committee, committee members repeatedly cited partisan political activity by his staff as evidence that the investigation was driven by partisan concerns.  *See* JA 185, ¶ 6 (citing Transcript of Robert S. Mueller III's testimony before the House Judiciary Committee, Wash. Post (July 24, 2019) (Mueller Tr.), https://www.washingtonpost.com/politics/transcript-of-robert-s-mueller-iiis-testimony-before-the-house-judiciary-committee/2019/07/24/7164abfe-ad96-11e9-a0c9-6d2d7818f3da_story.html); *see*

37

*also* JA 166, ¶ 12.  One Representative cited staff members' party affiliations:

"Millions of Americans today maintain genuine concerns about your work, in large

part, because of the infamous and widely publicized bias of your investigating

team members, which we now know included 14 Democrats and 0 Republicans."

*See* Mueller Tr. (statement of Rep. M. Johnson).  Another questioned whether the

Special Counsel satisfied his "obligation to operate with independence [and] to

operate with the appearance of independence" based on, among other things, the

fact that a staff member "attended Hillary Clinton's election night party."  *Id.*

(statement of Rep. Armstrong).  The same committee member also cited staff

members' campaign contributions of $12,000 to Hillary Clinton and $49,000 to

other Democrats.  *Id.*  Another suggested that the FBI investigation was launched

"as a result of the political leanings of a handful of FBI agents."  *Id.* (statement of

Rep. Collins).  Yet another described the Special Counsel's staff as a "team of

partisans," creating "concern that political bias[] caused important facts to be

omitted."  *Id.* (statement of Rep. McClintock).

    As these statements demonstrate, some members of Congress plainly saw

employees' political activities as evidence that the Special Counsel's investigation

was driven by partisanship, thereby diminishing its legitimacy.  The same evidence

may also have influenced the legitimacy of the Office of the Special Counsel

before the broader public.  Although that impact is difficult to measure, some

commentators in the media concluded that staff members' partisan political activity "undercut [the Special Counsel's] credibility from the moment they became known." Michael Goodwin, *Mueller's testimony equals end of any Trump impeachment talk*, N.Y. Post (July 24, 2019), https://nypost.com/2019/07/24/muellers-testimony-equals-end-of-any-trump-impeachment-talk/; *see also, e.g.*, Howie Carr, *Mueller stumbles, forgets, passes on that question*, Boston Herald, https://www.bostonherald.com/2019/07/24/howie-carr-mueller-stumbles-forgets-passes-on-that-question/.

ii.     The Judiciary faces threats to its legitimacy from many sources, including from abroad. The Director's declaration notes that "foreign governments have sought to exploit perceived instances of partisanship to sow distrust in the Judiciary." JA 144, ¶ 25. For example, Russian groups have used Facebook and Twitter to spread false information aimed at provoking outrage over contentious issues related to the justice system. *See* Suzanne Spaulding & Harvey Rishikof, *How Putin Works to Weaken Faith in the Rule of Law and Our Justice System*, Lawfare (Sept. 17, 2018), https://www.lawfareblog.com/how-putin-works-weaken-faith-rule-law-and-our-justice-system. Such messaging "does not always support one ideology over another," but rather "aims to sow discord by incensing individuals on *both* sides of divisive issues." *Id.* (citing example where Russian-operated Facebook group falsely accused judge and prosecutor of covering up

alleged rape by immigrants).  Similarly, "Russia's English-language propaganda outlets, RT and Sputnik routinely produce content that alleges corruption, partisanship, and fundamental unfairness of the justice system." *Id.*  Those seeking to undermine the Judiciary's legitimacy have an incentive to identify partisan political activity by Judicial Branch employees and then disseminate that information as part of a political narrative.

Bad faith is not required, however, for partisan political activity to harm the Judiciary's perceived integrity.  The Judicial Branch often addresses contentious issues not only through its judgments, but also through its broader policy role in areas like criminal justice reform, judgeships, judicial ethics, and civil procedure. JA 138, ¶ 14(d).  Even neutral observers of partisan political activity by judicial employees may question what role partisan preferences played in the process. Those who disagree with the Judiciary's positions—for example, the draft advisory opinion discussed above—may naturally be inclined to accept that partisan bias explains those positions.

Treating employees' partisan activities as evidence of partisanship in government institutions has become a regular feature of modern political debate.  A former Chief Counsel to the Senate Judiciary Committee explained in a declaration that "I am aware of firms whose business models include the dissemination of this type of political information in order to seek to portray particular groups or

individuals as supporting or opposing a particular partisan agenda."  JA 168-69,

¶ 16.  In one recent example, an opposition research firm submitted Freedom of

Information Act requests seeking correspondence from employees of the National

Oceanic and Atmospheric Administration and the Environmental Protection

Agency who made campaign contributions to a particular member of Congress and

others from the same party.  *See* Rebecca Leber, *A Republican Firm Is Targeting*

*EPA Staff Who Have Donated to Democrats*, Mother Jones (Aug. 21, 2019),

https://www.motherjones.com/politics/2019/08/a-republican-firm-is-targeting-epa-

staff-who-have-donated-to-democrats/.  The targets, which "included an EPA

geologist, several EPA attorneys, and a National Weather Service staffer," were

linked only by the fact of their contributions.  *Id.*  The firm appeared to be looking

for evidence of prohibited partisan political activity.  *Id.*

> **2.    Unrestricted partisan political activity threatens the perceived integrity of the AO and the rest of the Judicial Branch**

Perceptions and allegations of partisanship pose a unique threat to the

Judicial Branch because, unlike the political branches, its legitimacy depends on

perceived freedom from partisan influence.  For this reason, the Judicial

Conference approved restrictions on partisan political activity in the Courthouse

Code that are generally more stringent than those that apply to Executive Branch

employees under the Hatch Act.  These restrictions prohibit many of the partisan

political activities used to undermine the legitimacy of government institutions in the examples above.

The Courthouse Code applies to judicial employees who work in courthouses, whereas judicial employees who work in the AO are governed by the AO Code.  Prior to the 2018 updates, the AO Code lacked some of the restrictions on partisan political activity included in the Courthouse Code.  AO employees were therefore free to engage in some partisan political activities that would be prohibited for their courthouse counterparts.

This discrepancy existed even though even though, in many cases, AO employees are more visible representatives of the Judicial Branch than courthouse employees.  As explained, the AO is responsible for representing the Judiciary before the elected branches and the public; employees performing such roles are by design more visible than most courthouse employees.  When AO employees perform administrative or advisory roles that are not outward-facing, their roles are comparable to those of courthouse employees who perform similar tasks—for example, providing information technology support to judges.  Both sets of employees perform functions that are not connected to decisionmaking in individual cases, but the AO Code permitted the AO employees to engage in partisan political activity that would have been prohibited for equivalent courthouse employees.  Courthouse employees who do have a role in such

decisionmaking—for example, judicial clerks and staff attorneys—are generally subject to the strictest level of restrictions in the Courthouse Code, which prohibits both partisan and nonpartisan political activity.

The AO reasonably determined that permitting AO employees to engage in the restricted partisan political activities would pose an unacceptable risk of undermining the perceived integrity of the Judicial Branch and the AO, and hence that it was necessary to conform the AO Code to the restrictions in the Courthouse Employee Code.  In doing so, the Director considered the impact of the restricted activities on three audiences.

*First*, unrestricted partisan political activity would threaten the general public's perception of the integrity of the Judicial Branch.  Much of the general public may be unfamiliar with the AO and its role within the Judicial Branch— indeed, only 26 percent of Americans can name all three branches of government. JA 183, ¶ 2.  However, such confusion only makes it more likely that partisan political activity will be attributed to the Judiciary as a whole.  Members of the general public are unlikely to differentiate employees of "the Administrative Office of the U.S. Courts" from employees who work in a courthouse.  Indeed, someone seeking to impugn the Judicial Branch as a whole may intentionally elide the distinction.  Moreover, because the AO serves as a prominent public face of the Judiciary—staffing public hearings of the Conference, issuing press releases on

behalf of the Judiciary, and serving as the media's point of contact for comment by the Judiciary on federal court decisions or other newsworthy matters, JA 137-38, ¶ 14(a), (b)—it is not outside the public eye.

The general public need not directly observe AO employees' partisan political activity for harm to occur. As the above examples illustrate, media, politicians, third-party groups, and even foreign governments regularly search for government employees' partisan political activity as evidence of partisanship in the government institutions they work for. Once discovered, such evidence can be disseminated to the general public through traditional media, social media, and even Congressional hearings.

*Second*, partisan political activity may threaten the Judicial Branch's perceived integrity in the eyes of the political branches, particularly Congress. The Judiciary relies on congressional action for many of its most important prerogatives, as well as for the passage of legislation relating to the Judiciary, and its principal representative before Congress is the AO. At any given moment, the AO could be before Congress advocating for (or opposing) the passage of specific legislation affecting the Judiciary, requesting funding for court operations, or explaining why Congress should create new judgeships or build a new courthouse in a particular district. *See supra* pp. 8-10.

As explained in declarations from former Congressional staff members, the AO's effectiveness in representing the Judiciary before Congress depends in great part on the nonpartisan reputation that AO employees have developed among members and their staffs. JA 164, ¶ 9; JA 173, ¶ 4; JA 177, ¶ 12. AO employees with the backing of the Conference are understood within Congress to speak for the entire Judicial Branch. JA 175, ¶ 9; JA 162-63, ¶ 6; JA 137-38, ¶ 14(a), (b). Those employees relay the Conference's positions solely in terms that reflect the best interests of the courts. JA 164-65, ¶¶ 9-10; JA 173, ¶ 4; JA 175-76, ¶ 10; JA 177, ¶ 12; JA 173, ¶ 4; JA 177, ¶ 12.

Given these extensive interactions, it is reasonable to believe that partisan political activities by AO employees may become known within Congress, and that this knowledge could damage the Judiciary's nonpartisan reputation in Congress and frustrate the AO's efforts on behalf of the Judiciary. JA 177, ¶ 12; JA 166, ¶ 12. As the declarations explain, observers could realistically "doubt that the AO was approaching the business of the Judiciary without regard to politics, thereby undermining the federal Judiciary's reputation and effectiveness." JA 178, ¶ 13; *see also* JA 158-59, ¶ 10. Recent experience confirms that at least some members of Congress are receptive to arguments attributing Judicial Branch actions to partisanship. *See supra* pp. 36-37.

*Third*, unrestricted partisan political activity poses a threat to federal judges' perceptions of the impartiality of the AO.  AO employees provide a broad array of services and support to judges nationwide.  *See supra* at pp. 6-8, 11; JA 131-32, ¶¶ 6-7; JA 155-57, ¶¶ 4-5.  Much of this work relates to the Judicial Conference's role developing and implementing national policy for the Judiciary.  JA 132-33, ¶ 9.  AO employees also regularly provide guidance and counsel to federal judges regarding, among other things, ethics and recusals, participation in sponsored outside activities, misconduct issues, and gifts and reimbursements.  JA 136-37, ¶ 12(a)-(b); JA 158, ¶ 8.

Because of these key functions, it is essential that judges not have cause to question whether they can rely on the AO and its employees for objective, nonpartisan information and advice.  JA 149, ¶ 33.  If judges harbored even some doubt on this score, the AO's ability to fulfill its statutory objective would suffer.  Were AO employees—many of whom are personally known to at least some federal judges, *see* JA 132-37, ¶¶ 8-13; JA 139, ¶ 15—permitted to engage in the restricted activities, however, there is a reasonable likelihood that federal judges would become aware of some of these activities and, as a result, lose at least some faith in the AO's independence from partisan politics, thereby harming the AO's efficacy as the Judiciary's advisor, advocate, and administrator.

46

### 3.    The restrictions at issue target activities that threaten harm to the perceived integrity of the Judicial Branch and the AO

Each of the restrictions enjoined by the district court prohibits partisan political activity that, if unrestricted, could threaten serious harm to the perceived integrity of the Judicial Branch and the AO.  Press accounts, declarations filed in this case, and common sense confirm the ways in which these activities can damage the Judiciary's perceived freedom from partisan influence.[5]

### a.    Contributing funds to a political party, political action committee, or partisan candidate.

Evidence of government employees' campaign contributions has regularly featured in attempts to characterize government institutions as partisan, perhaps because such data is easy to obtain.  The history of an individual's political contributions, including employment information, is publicly available through the Federal Election Commission's website.  JA 168-69, ¶ 16; JA 180, ¶ 18; *see also* Federal Election Comm'n, *Campaign Finance Data*, https://www.fec.gov/data/ (last visited Nov. 17, 2020).  It is therefore quite easy to locate the contribution history particular AO employees or AO employees as a whole.  For example, the Washington Post used FEC data to determine the percentage of campaign contributions that went to Democrats from employees of four federal agencies; the

---

[5] For brevity's sake, the discussion below groups similar restrictions together.

highest was 82 percent.  Philip Bump, *What campaign contributions tell us about the partisanship of government employees*, Wash. Post (Dec. 27, 2018), https://www.washingtonpost.com/politics/2018/12/27/is-trumps-dismissal-unpaid-government-employees-democrats-accurate/.

The potential for this data to be used as part of a political narrative is high. JA 168-69, ¶ 16 (discussing firms whose business models include collecting and using contribution data).  If a single actor seeks out such data, it can be used to portray certain individuals or groups as supporting or opposing a partisan agenda, and thereafter disseminated by news media as part of a broader political narrative. *Id.*; JA 180, ¶ 18.  For example, contributions by members of Special Counsel Mueller's staff to partisan candidates were used to call into question the legitimacy of the Special Counsel's investigation, both in the media and before Congress.  *See supra* pp. 37-38.  In another recent example, a member of Congress posted on Twitter the names and employers of 44 San Antonio residents who donated the maximum amount to a presidential candidate, stating that "[t]heir contributions are fueling a campaign of hate that labels Hispanic immigrants as 'invaders.'"  *See* Joaquin Castro (@Castro4Congress), Twitter (Aug. 5, 2019, 11:13 p.m.), https://twitter.com/Castro4Congress/status/1158576680182718464?s=20.

Disclosure of AO employees' political contribution histories, particularly if used in a narrative of perceived partisanship, would threaten the Judiciary's and the

AO's hard-won reputation for nonpartisanship.  In particular, members of Congress and their staff in particular are "highly attuned to individuals' and entities' political contribution histories," and "knowledge of AO employees' histories would very likely color how the judiciary's views are heard and understood in the relevant congressional committees."  JA 168-69, ¶ 16; *cf.* JA 180, ¶ 18.

> **b.**     **Being a member of a partisan organization; attending a party convention, rally, or meeting; attending an event for a partisan candidate; attending a partisan fundraiser.**

Membership in a partisan organization or attendance at a partisan political event are less easily identified than an individual's contribution history, but such information is also likely to be used as evidence for allegations of partisanship. For example, committee members suggested during the Special Counsel's testimony that the inquiry was partisan because of the party membership of the Special Counsel's staff and because a staff member "attended Hillary Clinton's election night party."  *See* Mueller Tr. (statement of Rep. M. Johnson).

Party conventions, rallies, and meetings are frequently captured on video or in photographs and are increasingly the subject of social media posts and media broadcasts.  Observers are likely to understand attendance at such events as evincing an inherent partisan preference, which could cause federal judges, members of Congress and staff, or the general public to doubt the objectivity of the AO employee when advocating on behalf of the Judiciary.  JA 180, ¶ 17; JA 167,

¶ 14.  That is particularly true in Congress, where an individual's partisan affiliation is often viewed as a defining characteristic.  JA 180, ¶ 17; JA 168-69, ¶ 16.

### c.    Expressing opinions publicly regarding a political party or partisan candidate.

Public expressions of support for or opposition to political parties or candidates have obvious potential to produce perceptions of partisanship.  That outcome is particularly likely given the wide distribution of statements on social media, which is increasingly relevant to political and civic life, and where postings initially intended for a limited audience can "attain 'viral' distribution."  *Id.*

Statements on social media, even if made in a personal capacity, may well be discovered by congressional staffers, who often perform Internet searches on the backgrounds—including political affiliations—of individuals they or their members meet.  JA 167, ¶ 13; JA 178, ¶ 14.  Indeed, social media can play a particularly outsized role in Congress, where members can be "especially sensitive to public opinion expressed on social media."  JA 178, ¶ 14.  In short, "any expression of partisan affiliation by an AO employee may reach members and their staffs working with that employee," and "it is especially likely for expressions on social media."  *Id.*

Similarly, were an AO employee to express partisan opinions in social media, a letter to the editor, or an Internet post, that posting could easily reach a

federal judge who interacts with the employee.  That partisan expression could, in turn, cause that judge to question whether he or she can rely on that AO employee for nonpartisan, objective information or support.  JA 149, ¶¶ 33-34.

Finally, AO employees' partisan statements on social media or other Internet sites can reach members of the general public.  If AO employees identify as employees of the Judiciary or the AO on the sites on which the posts appear, readers may associate those partisan statements with the Judiciary.  Even when an AO employee intends his statement to have limited distribution, a partisan-aligned media organization or publication, or even a foreign government, could locate such statements and exploit them to promote a partisan agenda or weaken public confidence in the Judiciary.  JA 144, ¶ 25; JA 168-69, ¶ 16.

### d. Wearing or displaying partisan badges, signs, or buttons.

Although the immediate audience for a campaign sign or a partisan button is limited, JA 178-79, ¶ 15, such activity nonetheless has a significant chance of being cited as evidence of partisanship.  In one recent example, Navy sailors were "photographed wearing red patches that featur[ed] an illustration of [President] Trump and the words 'Make Aircrew Great Again,'" prompting the Secretary of the Navy to warn sailors against activities that could imply endorsement of a partisan candidate.  Gina Harkins, *After "MAGA" Patches, McCain Scandal, Navy Issues New Memo on Political Activities*, Military.com (June 26, 2019),

https://www.military.com/daily-news/2019/06/26/after-maga-patches-mccain-

scandal-navy-issues-new-memo-political-activities.html.

Aside from the Internet's potential amplifying effects, some partisan

displays carry the potential of being directly viewed by a federal judge. For

instance, a campaign bumper sticker on a car in the AO parking garage, or a

partisan button on an AO employee's bag, may readily be seen by judges given

that, on any particular day, there are likely more federal judges in the Thurgood

Marshall Building than in any one courthouse in the country.  JA 132-33, ¶ 9.  At

the same time, more than 100 federal judges sit on the many courts in the

Washington area, and because the AO's primary office is in Washington, D.C.,

most AO employees live in the greater metropolitan area as well.  JA 131-32, ¶ 7;

JA 141, ¶ 20.  An AO employee putting up a campaign sign or wearing a candidate

t-shirt while running errands in her neighborhood could therefore be seen by a

federal judge.  JA 178-79, ¶ 15.  That type of visible partisan affiliation could

undermine a judge's confidence that the AO employee is providing objective,

nonpartisan support or counsel.

It is even more likely that an AO employee's display of a campaign sign or

button will reach members of Congress or their staffs.  JA 178-79, ¶ 15; JA 167,

¶ 14.  The Thurgood Marshall Building is next to Union Station and Capitol Hill.

JA 146, ¶ 28.  With most members of Congress and their staffs living in the

Washington area, it was reasonable for the AO to conclude that an AO employee's display of a campaign sign or candidate t-shirt could become public knowledge within Congress. *Id.*; JA 167, ¶ 14. That type of partisan affiliation by an AO employee, which to date has not typically been known to congressional staffers, *see* JA 165-66, ¶ 11; JA 177, ¶ 12, could undermine the nonpartisan reputation of the AO and the Judiciary as a whole.

### 4. The District Court erred in dismissing the government's concerns

The district court rejected the government's explanations for how the restricted activities threaten the Judiciary's reputation for nonpartisanship. In the court's view, the government's analysis depended on an unrealistic chain of events:

> To create the appearance of impropriety at which the Code is aimed, members of the public would need to observe an AO employee engaged in partisan activity, somehow come to know that the person in the photo or social media post is an AO employee, understand that AO employees work with federal judges, but mistakenly believe that they play a role in handling individual cases, and assume—based on ordinary expressions of political preference—that the AO employee is so politically biased that she would be willing to violate her professional ethical obligations by attempting to sway the outcome of a case.

JA 220-21. The court doubted that the public would be aware of the AO "and yet at the same time misapprehend its basic role," and that the public "would interpret routine acts of political expression . . . as evidence of such extreme partisanship

53

that the AO employees would choose to subvert the processes of judicial decision-making."  JA 221.

Even setting aside that the same could be said of the Courthouse Code, the district court's reasoning suffers from at least two major flaws.  First, the district court erred in assuming that the Judiciary's legitimacy turns only on its perceived integrity in "handling individual cases."  To the contrary, the Judiciary's policymaking role, in which the AO plays a significant part, also affects—and is affected by—its reputation for impartiality.  For example, as discussed above, some media commentators and members of Congress accused the Judiciary of partisanship with respect to a draft advisory opinion on judges' memberships in certain law-related organizations.  *See supra* pp. 36-37.   One editorial asserted that the opinion would "risk[] tarnishing the reputation of the judiciary as even-handed and nonpartisan."  Editorial, *More Judicial Political Mischief*, *supra*, A14.  A member of Congress subsequently requested detailed information from the AO about the process of preparing the draft opinion.  *See supra* pp. 36-37.  If the staff members in the AO who helped prepare the draft opinion were publicly linked to partisan political activity, that activity would surely be used as further evidence that the Judiciary was acting in a partisan manner.  Such allegations would threaten the perceived legitimacy of the Judicial Branch as a whole.

54

Second, the district court failed to recognize that, given modern trends, members of the public need not directly observe partisan activity for that activity to affect their perceptions of the Judicial Branch.  To the contrary, the media, third-party groups, and politicians often search for evidence of partisan political activity and then disseminate it to the public.  *See supra* pp. 36-41, 48.  For example, although members of the general public were unlikely to directly observe Navy sailors wearing "Make Aircrew Great Again" badges, images of that activity were widely disseminated to the public through national media.  The growth of social media further accelerates the spread of such information.

The district court asserted that the government failed to offer evidence of these trends, but that conclusion was incorrect.  The government cited several recent examples in which employees' partisan political activity was used to attack the legitimacy of government institutions, as well as examples in which social media was used to spread such allegations.  *See supra* pp. 36-41, 48.  Moreover, the scrutiny the AO received from Congress regarding the draft advisory opinion discussed above could easily have led to inquiries into the partisan political activities of AO employees.

The AO need not "'allow events to unfold to the extent that the disruption . . . is manifest before taking action.'"  *Baumann*, 795 F.3d at 217 (quoting *Connick*, 461 U.S. at 152).  Having observed such attacks in the context of other

government institutions and the Judiciary, the AO was not required to wait for such allegations to cause concrete harm to the Judiciary's legitimacy.

### C.    The Sweep of the Challenged Restrictions is Reasonably Necessary to Protect the Perception of Judicial Integrity

Finally, "the regulation's sweep is reasonably necessary to protect the efficiency of the public service." *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474). As explained above, each of the restricted activities, if unchecked, would threaten the perception of the Judicial Branch's integrity. The challenged restrictions directly address the partisan political activities at issue while leaving employees free to engage in nonpartisan political activities.

1.    The district court concluded, however, that the revised AO Code was not "reasonably necessary to protect the efficiency of the public service," *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474), because the AO could instead have relied on the more limited restrictions in the prior version of the Code. JA 222. That version of the Code required employees to "act impartially'" and "observe high standards of conduct so that the integrity and independence of the judiciary are preserved." *Id.* The court's conclusion was erroneous.

The AO reasonably determined that "after-the-fact disciplinary actions" under the prior Code, JA 223, were insufficient to protect the government's interest. The district court's reasoning assumes that employees' conduct must be clearly inappropriate to risk harm to the Judiciary's perceived integrity. The

examples discussed above illustrate, however, why normal partisan conduct—for example, campaign contributions within legal limits or attending an election night party—may nonetheless lead to perceptions of partisanship in government institutions.  Limiting the Code's restrictions to clear misbehavior would not redress these harms.

Moreover, retrospective discipline of the sort the district court contemplated poses unique risks in this context.  If the AO or the Judiciary undertook to discipline an employee based on judgment calls about whether a given partisan activity was appropriate—as opposed to clear ex ante prohibitions on specific conduct—the disciplinary proceeding may itself be cast as partisan.   JA 170, ¶ 18. Suppose, for example, that an AO employee used vitriolic social media postings to support a candidate of one party and make false accusations of misbehavior against a candidate of the opposite party, and that the AO determined this conduct to violate the requirement that employees "observe high standards of conduct." Partisans in the media and elsewhere could interpret the AO's disciplinary action as punishing the employee for supporting a particular party, leading to charges that the Judiciary itself is behaving in a partisan manner.  A Code of Conduct that clearly identifies restricted activities in advance reduces the potential for perceived politicization.

2.    The district court also wrongly faulted the restrictions in the AO Code as underinclusive because they do not require AO employees to remove evidence of prior partisan activity—for example, on social media.  JA 223.  But even under strict scrutiny, the government "need not address all aspects of a problem in one fell swoop."  *Williams-Yulee*, 575 U.S. at 449.  Indeed, neither the Hatch Act nor the Courthouse Employee Code requires employees to remove evidence of pre-employment partisan activity.  Similarly, judges may have engaged in political activity before joining the bench, but they are expected to act apolitically in public once they are part of the Judiciary.  Declining to apply the AO Code's restrictions retroactively to pre-employment conduct is consistent with the restrictions' purpose of avoiding the perception that judicial employees are entangled with partisan politics; the restrictions are not intended to create a false impression that employees have never been partisan at any point in their lives.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court with respect to the seven enjoined restrictions.

Respectfully submitted,

JEFFREY BOSSERT CLARK
  *Acting Assistant Attorney General*
SCOTT R. MCINTOSH

s/ Weili J. Shaw
WEILI J. SHAW
  *(202) 514-1371*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*

NOVEMBER 2020

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 12,906 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Times New Roman 14-point font, a proportionally spaced typeface.

s/ Weili J. Shaw
WEILI J. SHAW

**ADDENDUM**

# TABLE OF CONTENTS

AO Code of Conduct (effective March 1, 2018) ...................................................... 1

**ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS**

**AO MANUAL**

**Volume 4: Human Resources**

**Chapter 2: AO Code of Conduct**

. . . .

### § 260 Canon 5: An Employee Should Refrain from Inappropriate Political Activity

(a) Partisan Political Activity

An employee should:

(1) refrain from partisan political activity;

(2) not act as a leader or hold any office in a partisan political organization;

(3) not make speeches for or publicly endorse or oppose a partisan political organization or candidate;

(4) not solicit funds for or contribute to a partisan political organization, candidate, or event;

(5) not become a candidate for partisan political office; and

(6) not otherwise actively engage in partisan political activities.

(b) Nonpartisan Political Activity

(1) Designated employees (including the Director, the Deputy Director, and the AO Executive Management Group) should refrain from:

(A) nonpartisan political activity such as campaigning for or publicly endorsing or opposing a nonpartisan political candidate;

(B) soliciting funds for or contributing to a nonpartisan political candidate or event; and

(C) becoming a candidate for nonpartisan political office.

(2) Other employees may engage in nonpartisan political activity only if such activity does not:

(A) tend to reflect adversely on the dignity or impartiality of the court or office, or

(B) interfere with the proper performance of official duties.

(3) An employee may not:

    (A) engage in such activity while on duty or in the judicial employee's workplace, and

    (B) use any federal resources in connection with any such activity.

(c) See also: 18 U.S.C. chapter 29 (Elections and Political Activities).