ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 20-5183 & 20-5208

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**LISA GUFFEY** and **CHRISTINE SMITH**,

*Plaintiffs-Appellees/
Cross-Appellants*,

v.

**JAMES C. DUFF**, in his official capacity as
Director of the Administrative Office of the United States Courts,

*Defendant-Appellant/
Cross-Appellee*.

_____

Appeal from the U.S. District Court for the District of Columbia
(No. 1:18-cv-01271)

_____

**PRINCIPAL BRIEF FOR APPELLEES/CROSS-APPELLANTS**

<div style="margin-left:40%">

Scott Michelman
Arthur B. Spitzer
Michael Perloff
American Civil Liberties Union
  Foundation of the District of Columbia
915 15th Street NW, Second Floor
Washington, DC 20005
(202) 601-4267
smichelman@acludc.org

</div>

December 18, 2020

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. Parties and Amici

The parties before the district court and this Court in this case are:

Lisa Guffey (Plaintiff-Appellee/Cross-Appellant)

Christine Smith (Plaintiff-Appellee/Cross-Appellant)

James C. Duff (Defendant-Appellant/Cross-Appellee)

The Chief Judge of the D.C. Circuit is a member of the Judicial Conference and may have acted in this matter either through involvement with the Defendant's development and/or promulgation, in 2017 and 2018, of the rules that Plaintiffs challenge in this action, or with regard to the Defendant's 2020 decision to file this appeal.

B. Rulings Under Review

The rulings under review in both the appeal and the cross-appeal are the Order and Opinion of the U.S. Court of Appeals for the District of Columbia Circuit (Cooper, J.), No. 1:18-cv-01271-CRC, ECF 33 & 34 (April 29, 2020).

The opinion is reported: *Guffey v. Duff*, 459 F. Supp. 3d 227 (D.D.C. 2020).

C. Related Cases

There are no related cases of which counsel are aware.

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY.................................................................................... vii

INTRODUCTION ...............................................................................1

JURISDICTION..................................................................................3

ISSUE PRESENTED ...........................................................................3

STATEMENT OF THE CASE..................................................................3

    A. The AO and the Plaintiffs ...........................................................3

    B. The New AO Code ....................................................................4

    C. The Evolving Justifications for the New Code................................6

    D. The Effects of the New Code .....................................................7

    E. Procedural History ...................................................................8

    F. The Decision Below .................................................................9

SUMMARY OF ARGUMENT ..............................................................14

STANDARD OF REVIEW ..................................................................18

ARGUMENT ..................................................................................18

    I.    The Government Bears A Heavy Burden To Justify *Ex Ante* Employee-Speech Restrictions, And The District Court Demanded The Proper Showing From The Director As To Each Of His Justifications..............18

    II.    The District Court Correctly Concluded That The Seven Enjoined Restrictions Violated Plaintiffs' First Amendment Rights. ....................25

A.  The district court correctly concluded that the Director's interests were insufficient to justify the restrictions given their enormous burden on Plaintiffs' core political speech..............................................................26

1.  The Public Perception Interest is undermined by the government's own evidence and depends on a lengthy chain of implausible assumptions. ................................................................................29

   a.  *The district court's analysis was correct.* ..............................29

   b.  *The only non-conjectural material in the record further undermines the Director's fears.*............................................32

   c.  *The government's hypotheticals are as implausible now as they were before the district court, and its attempts to bolster them by focusing on non-adjudicatory functions, partisanship, and social media are unpersuasive.* ..............................................36

2.  The government fails to carry its burden as to the Inter-branch Interest............................................................................................42

3.  The government fails to carry its burden as to the Intra-branch Interest............................................................................................44

4.  The Unity Interest is patently insufficient to overcome Plaintiffs' First Amendment rights, and the existence of the Courthouse Code does not rescue the Director's other inadequate rationales............46

B.  The district court rightly held that the government failed to tailor the Challenged Restrictions to realistic harms. ...........................................48

III.  The District Court Erred In Upholding The Driving And Organizing Restrictions, Which Violate Plaintiffs' First Amendment Rights............55

IV.  The Director Does Not Dispute That The Remaining Factors Of The Preliminary Injunction Analysis Favor Plaintiffs Or That The Scope Of The Injunction Was Proper......................................................................63

CONCLUSION.......................................................................................64

CERTIFICATE OF WORD COUNT....................................................65

# TABLE OF AUTHORITIES

## *Cases*

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017)..................................................24

*Am. Postal Workers Union v. U.S. Postal Serv.*, 764 F.2d 858 (D.C. Cir. 1985) ...30

*Baumann v. District of Columbia*, 795 F.3d 209 (D.C. Cir. 2015) ........................23

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) .................................................. 23, 24

*Castle v. Colonial Sch. Dist.*, 933 F. Supp. 458 (E.D. Pa. 1996) .......................... 32

*Citizens United v. FEC*, 558 U.S. 310 (2010) ........................................................60

*Connick v. Myers*, 461 U.S. 138 (1983)..................................................................23

*Eu v. S.F. Cty. Dem. Cent. Comm.*, 489 U.S. 214 (1989) ......................................27

*Ex parte Curtis*, 106 U.S. 371 (1882) ...................................................................59

*Goodman v. City of Kansas City*, 906 F. Supp. 537 (W.D. Mo. 1995) .................32

*Guffey v. Duff*, 330 F. Supp. 3d 66 (D.D.C. 2018) .................................................8

*Guffey v. Duff*, 459 F. Supp. 3d 227 (D.D.C. 2020) ................................................i

*Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971) ...........................................31, 32

*\*Janus v. Am. Fed'n of State, Cty., & Mun. Employees*,
138 S. Ct. 2448 (2018) ...................................................................... 19, 22

*Lalowski v. City of Des Plaines*, 789 F.3d 784 (7th Cir. 2015)...............................23

*Lodge No. 5, Fraternal Order of Police v. City of Phila.*,
763 F.3d 358 (3d Cir. 2014) ...................................................................21

*\*McCutcheon v. FEC*, 572 U.S. 185 (2014) ........................................10, 27, 48, 60

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ....................................................18

*Repub. Party of Minn. v. White*, 536 U.S. 765 (2002) ...........................................27

*\*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ..............................13, 21, 48, 53, 63

*Tashjian v. Repub. Party of Conn.*, 479 U.S. 208 (1986) ......................................27

*\*Authorities on which we chiefly rely are marked with an asterisk.*

iv

*United Public Workers v. Mitchell*, 330 U.S. 75 (1947) ...................................59, 61

*United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013) ....................................35

*\*United States v. Nat'l Treasury Employees Union*,

    513 U.S. 454 (1995)....9, 10, 19, 21, 26, 30, 42, 44, 45, 48, 49, 50, 53, 60, 61

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,

    413 U.S. 548 (1973) ..............................................................53, 59, 60

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ...........................................24, 50, 51

*Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ....................24

*Williams v. Rhodes*, 393 U.S. 23 (1968) .................................................................27

*\*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ...............................10, 37, 38

**Statutes**

5 U.S.C. § 3132 .........................................................................................................58

5 U.S.C. § 5372 .........................................................................................................58

5 U.S.C. § 5372a .......................................................................................................58

5 U.S.C. § 5372b .......................................................................................................58

5 U.S.C. § 7323 .............................................................................................51, 52, 57, 58

5 U.S.C. § 7324 .........................................................................................................52

**Rules and Regulations**

Fed. R. Civ. P. 56(c)(4) ............................................................................................35

Fed. R. Evid. 701 ......................................................................................................35

5 C.F.R. § 734.202 ....................................................................................................52

5 C.F.R. § 734.203 ....................................................................................................52

5 C.F.R. § 734.204 ....................................................................................................52

5 C.F.R. § 734.205 ....................................................................................................52

5 C.F.R. § 734.206 ..............................................................................................52, 58

*\*Authorities on which we chiefly rely are marked with an asterisk.*

5 C.F.R. § 734.208 ...............................................................52

5 C.F.R. § 734.401 ...............................................................52

5 C.F.R. § 734.402 ...............................................................52

5 C.F.R. § 734.404 ...............................................................52

5 C.F.R. § 734.410 ...........................................................52, 58

5 C.F.R. § 734.412 ...........................................................52, 58

### Secondary Sources

Carpool Vote, *Frequently Asked Questions*, *at* https://carpoolvote.com/faq/ (last visited July 24, 2019) ................................................56

Cynthia Brown & Jack Maskell, Cong. Res. Serv., *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age* (Apr. 13, 2016), *at* https://fas.org/sgp/crs/misc/R44469.pdf ...............................60

General Information on Administrative Decisions*, U.S. Dep't of Vets. Affairs, M21-1, Pt. III, Subp. v, Ch. 1, at III.v.1.A.1.b—Who Makes, Documents, and Approves Administrative Decisions* (last visited Dec. 17, 2020) *at* https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000014216/M21-1-Part-III-Subpart-v-Chapter-1-Section-A-General-Information?query=%22veterans%20service%20representative%22....................59

House of Representatives Report No. 103-16 (1993) .......................60, 61

Mauet & Wolfson*, Trial Evidence* (2d ed. 2001) .................................35

Nelson & Gibson, *Has Trump Trumped the Courts?* NYU L. Rev. Online Symposium 32 (April 2018) .................................................40

*\*Authorities upon which we chiefly rely are marked with asterisks.*

## GLOSSARY

| | |
|---|---|
| AO | Administrative Office of the United States Courts |
| CIA | Central Intelligence Agency |
| DOJ | Department of Justice |
| EPA | Environmental Protection Agency |
| FBI | Federal Bureau of Investigation |
| FEC | Federal Election Commission |
| JA | Joint Appendix |
| *NTEU* | *United States v. Nat'l Treas. Employees Union*, 513 U.S. 454 (1995) |
| SEC | Securities and Exchange Commission |

## INTRODUCTION

In this case, 1100 federal employees face First Amendment restrictions that are, in the district court's words, "as serious as they come." JA 215. Plaintiffs are employees of the Administrative Office of the U.S. Courts ("AO"), which provides administrative and programmatic support to the federal judicial branch but is not involved in the process of adjudicating cases. The speech code at issue prohibits AO employees (two of whom are Plaintiffs here) from many ordinary activities of political engagement—such as expressing their views publicly, contributing to their favored candidates, or attending a campaign rally—even on their own time, outside of work, and without identifying themselves with the AO. Thus, the restrictions cut Plaintiffs off from a broad swath of political activity that is at the heart of our democracy and of what the First Amendment protects.

The AO's Director, Defendant James Duff, attempts to justify these severe restrictions by predicting that without them, the public will lose confidence in the federal judiciary, and congressional staffers and even judges themselves will no longer trust the AO. But the Director cannot plausibly tie the sweeping restrictions on Plaintiffs' political participation to harms that are even remotely likely to occur; instead, he relies on hypotheticals comprised of lengthy chains of unrealistic events. In fact, no harm has befallen his agency in eighty years of operation without these new restrictions, and two former governmental officials—the Director's own

1

declarants—aver the AO has enjoyed a splendid reputation for partisan neutrality even while employees were free to post lawn signs, display bumper stickers, criticize political candidates on social media, contribute to candidates, belong to parties, and engage in other core First Amendment activities the Director would now prohibit.

The district court rightly held that the Director failed to carry his heavy burden to justify stripping Plaintiffs and more than a thousand other employees of some of their most fundamental rights in our democratic system. The court was also correct that the restrictions at issue were not appropriately tailored to the posited harms. Accordingly, the district court permanently enjoined prohibitions on expressing opinions publicly about parties and partisan candidates; displaying partisan signs and buttons; donating to parties or partisan candidates; attending partisan fundraisers; attending partisan candidates' events; attending party rallies and meetings; and being a party member.

Plaintiffs challenged two other restrictions as well—on driving voters to polls on behalf of a party and on organizing events for partisan candidates. The court erred in upholding these, because it relied on a misunderstanding of a federal statute it thought analogous and because it relied on precedents whose reasoning has been eclipsed by modern First Amendment doctrine.

This Court should hold that all of the challenged restrictions violate the First Amendment.

2

## JURISDICTION

Plaintiffs agree with the Director's statement regarding jurisdiction.

## ISSUE PRESENTED

Do the AO's severe restrictions against its approximately 1100 employees—which bar them, even outside of work and without identifying their employer or using government resources, from core First Amendment speech and association activities that are central to the democratic process—violate the First Amendment?

## STATEMENT OF THE CASE

### A. The AO and the Plaintiffs

Created in 1939, the AO provides "legislative, legal, financial, technology, management, administrative, and program support services to federal courts." JA 190 (citation and internal quotation marks omitted). AO employees carry out a variety of tasks in support of the federal judiciary but do not themselves decide cases or participate in the decisional process (in contrast to, for instance, a judge's law clerks). JA 190-91. Most of the AO's 1100 employees work in Washington. JA 190.

Plaintiff Lisa Guffey is an AO employee who helps administer court-appointed attorney programs and federal defender offices. JA 194. Plaintiff Christine Smith is an AO employee who addresses the information technology needs of federal defender offices and recommends cybersecurity policies. *Id.* Each interacts with

judges a handful of times per year. *Id.* Neither has any influence over the outcome of any case before any judge. *See id.*; *accord* JA 30-31 ¶¶ 3-4; JA 25 ¶ 3.[1]

The other employees of the AO likewise do not participate in the process of deciding cases. JA 191. Their functions include (among others) providing human resources, finance, and facilities-related support to the judiciary; overseeing programs like probation and pretrial services; evaluating case-management systems; acting as liaisons to the media and the other branches of government; recommending rules and policies for the judiciary; and advising judges on ethics. *See* JA 190-92. But AO employees make no final decisions on these matters: recommendations become "the policy of the Judicial Branch" only when approved by the Judicial Conference, *see* JA 133-34 ¶ 10, which consists of the Chief Justice and 26 other judges, along with committees comprised of other judges. JA 132 ¶ 9; JA 191. The limited role of AO employees is to "staff" or "support" the Conference and its committees. JA 133-34 ¶¶ 10-11.

## B. The New AO Code

Prior to March 1, 2018, AO employees (other than a handful of high-level "designated employees") were permitted to engaged in many off-duty political

---

[1] Plaintiffs (and the district court) describe Ms. Smith's role at the time the lawsuit was filed. She now works in the AO's Department of Technology Services, where she leads information-technology security assessments. She has no contact with judges. This change in job responsibilities has no bearing on her arguments.

activities, including expressing views on political candidates publicly, displaying political signs and badges, contributing to parties and partisan candidates for office, joining a political party, and attending political fundraisers. JA 83-86 (2016 AO Code of Conduct) § 260(a)(2), (b)(1), (c)(1), (c)(8), (c)(10), (e)(1), (e)(2) & (f); *see* JA 192-93. The former code did not permit AO employees to use their positions, titles, or authority in connection with these political activities, or to use federal resources for them. JA 84 (2016 AO Code) § 260(a)(4)-(5); *see* JA 193. The former code did require "AO employees to 'act impartially and not [to] give preferential treatment to any private organization or individual' and to 'observe high standards of conduct so that the integrity and independence of the judiciary are preserved.'" JA 193 (quoting JA 71-72 (2016 AO Code) § 220 & § 220(d)(1)).

The new Code of Conduct, effective March 1, 2018, added prohibitions on "partisan political activity," JA 52 (2018 AO Code) § 260 Canon 5(a)(1), and on "mak[ing] speeches for or publicly endors[ing] or oppos[ing] a partisan political organization or candidate," *id.* Canon 5(a)(3). Under this Code and the July 2017 interpretive guidance issued by Director Duff defining "partisan political activity," the following activities were forbidden even for off-duty AO employees not using government resources or identifying themselves with the AO:

    (1) expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office;

(2) wearing or displaying partisan political badges, signs, or buttons;

(3) driving voters to polls on behalf of a political party or partisan candidate for office;

(4) contributing funds to a political party, political action committee, or partisan candidate for office;

(5) attending partisan fundraisers;

(6) being a member of a partisan political organization (other than registering as a member of a party for voting purposes);

(7) attending events for a partisan candidate for office;

(8) organizing events for a partisan candidate for office; and

(9) attending party conventions, rallies, or meetings.

*See* JA 54-56 (App. to 2017 Duff Memo.); JA 193, 195-96. Plaintiffs call these prohibitions the "Challenged Restrictions."[2]

## C. The Evolving Justifications for the New Code

In announcing the new Code, Defendant Duff characterized the old rules as "out of step" with rules applicable to most courthouse staff, JA 194, and justified the new rules based on the need to convey "the unity of purpose between the AO and the courts" and demonstrate "that the AO is very much an integral part of the Judicial Branch and not an independent, isolated agency" (hereafter "the Unity Interest"). *Id.*

In response to a March 2018 letter on behalf of Plaintiffs asking that the Challenged Restrictions be rescinded, Director Duff opined that the new Code was

---

[2] Further restrictions, not at issue here, apply to six high-level "designated employees." *See* JA 53 (2018 AO Code) § 260 Canon 5(b)(1); JA 193 n.3.

6

necessary for "preserving public confidence in the integrity of its Judiciary" (hereafter "the Public Perception Interest"). JA 195. A year into this litigation, at summary judgment, the Director posited additional justifications for the new Code: maintaining the AO's reputation with other branches of government (the "Inter-branch Interest") and with judges (the "Intra-branch Interest"). *See* JA 198-99.

### D. The Effects of the New Code

The Challenged Restrictions would significantly curtail—in fact, throttle—political activity that Plaintiffs would otherwise engage in, along with opportunities for political engagement for the other 1100 employees of the AO. Both Plaintiffs have been politically active and desire to continue their political activities in many ways forbidden under the new Code. *See* JA 194-95. Plaintiff Guffey has donated money to a national party committee and to individual partisan candidates, posted yard signs for candidates, attended candidate fundraisers, and expressed opinions about candidates on social media. JA 34 ¶¶ 12-13. Plaintiff Smith has expressed her opinions publicly about candidates and parties (including via social media), displayed bumper stickers and buttons about candidates and parties, driven voters to polls on behalf of a party, donated to candidates and to a political party, attended and organized candidate fundraisers, and joined a political party. JA 27 ¶¶ 6-7.

Plaintiffs Guffey and Smith desire to engage in all these activities and more—although not during work hours, using work resources, or while identifying

7

themselves with the AO. When the Code went into effect in early 2018, Plaintiffs Guffey and Smith already intended to engage in political activities with respect to then-upcoming elections for governor, Congress, and President. JA 34 ¶ 14; JA 27-28 ¶¶ 8-10. For the several-month period in 2018 while the new Code was in effect (prior to the district court's preliminary injunction), it deterred both Plaintiffs from political activity in which they would otherwise have engaged, including attending events, contributing money, expressing views on social media, and wearing clothing expressing their political views. JA 34-35 ¶¶ 14-15; JA 28-29 ¶ 11.

The AO specifically told Plaintiffs that violating the Code would expose an employee to disciplinary action. JA 35 ¶¶ 15-17; JA 29 ¶¶ 12-14; JA 193.

### E. Procedural History

Plaintiffs filed this action in May 2018, seeking preliminary and permanent injunctive relief against the nine Challenged Restrictions based principally on the First Amendment.[3] In August 2018, the Court granted a preliminary injunction as to seven of the Challenged Restrictions and denied one as to the other two. JA 91-115 (reported as *Guffey v. Duff*, 330 F. Supp. 3d 66 (D.D.C. 2018)).

---

[3] Plaintiffs also included a vagueness claim "[i]n the alternative," *see* JA 21, in case the Director disclaimed his July 2017 specification of the acts forbidden under the Code. After the Director adopted his July 2017 guidance in this litigation, Plaintiffs conceded that the Code was not vague.

The following year, the parties cross-moved for summary judgment as to all nine restrictions. In April 2020, the court granted judgment to Plaintiffs as to the seven restrictions it had previously enjoined preliminarily: (1) expressing opinions publicly regarding a party or partisan candidate; (2) wearing or displaying partisan political badges, signs, or buttons; (3) contributing funds to a political party, political action committee, or partisan candidate; (4) attending partisan fundraisers; (5) being a member of a partisan political organization; (6) attending events for a partisan candidate; and (7) attending party conventions, rallies, or meetings (hereinafter the "Seven Enjoined Restrictions"). The court granted judgment to the government as to the other two Challenged Restrictions: against (1) organizing or managing political rallies or meetings ("the Organizing Restriction") and (2) driving voters to the polls on behalf of a party or candidate ("the Driving Restriction").

## F. The Decision Below

The court held that the Seven Enjoined Restrictions failed the balancing test prescribed in *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"). *See* JA 205-08. Under that test, the government bears the burden to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government," *NTEU*, 513 U.S. at 468, which means that it must show that the harms are "real, not

9

merely conjectural" and that the challenged regulation "will in fact alleviate these harms in a direct and material way." *Id.* at 475.

Regarding Plaintiffs' interests, the court observed that "'[t]here is no right more basic in our democracy than the right to participate in electing our political leaders,'" JA 214 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion)), and found that "the challenged restrictions strike at the core of that First Amendment-protected right." *Id.* (cleaned up). And they do so in "severe" fashion, the Court explained, as they "entirely ban some 1,100 citizens from engaging in bedrock First Amendment expression—even though the activities would occur on the employees' own time, without the use of any government resources, and without a readily identifiable link to the AO." JA 215. Accordingly, the Court concluded that the burden the Challenged Restrictions imposed on AO employees' First Amendment rights is "as serious as they come." *Id.* (cleaned up).

The court then evaluated the government's interests and the degree to which the Challenged Restrictions served them. At summary judgment, the government focused on three interests: the Public Perception Interest, the Inter-branch Interest, and the Intra-branch Interest. *See* JA 198-99. Given the Supreme Court's recognition that public trust in the judicial neutrality "does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," JA 210 (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 447 (2015); internal quotation marks omitted),

10

the court relaxed the government's burden with respect to the Public Perception Interest—permitting the government to attempt to carry its burden via "realistic hypotheticals," JA 213—while applying the "customary *NTEU* burden," JA 214, to the other two interests, because a broader departure from *NTEU* "would ... be unsupported by precedent," JA 211.

Even with the special dispensation for hypothetical harms as to the Public Perception Interest, the government could not carry its burden to justify seven of the Challenged Restrictions, the court held. The government offered no evidence "that a single AO employee has allowed their partisan views to affect their work." JA 218. And its hypotheticals—in which "members of the public were somehow informed that AO employees engaged in partisan activity" and as a result "public confidence in an impartial judiciary would suffer because the public would assume that partisan bias has influenced judges' handling and adjudication of cases," JA 220—were insufficiently realistic to justify most of the new Code's sweeping restrictions. Accepting the government's hypotheticals required following a long chain of speculation about what political activities members of the public observed, how they could know the person performing such activities was AO employee, what members of the public knew about the AO, what they might *mis*understand about how that agency works, and what they might assume based on witnessing ordinary acts of political participation. JA 220-21. The links in this long chain, moreover, "are fatally

11

weak," because it is unrealistic that members of the public would both "so attuned to the inner workings of the federal judiciary that they have heard of the AO" but "at the same time misapprehend its basic role." JA 221. The court refused to indulge the government's assumption that "the public would interpret routine acts of political expression" as evidence that AO employees were so partisan as to resort to "subvert[ing] the processes of judicial decision-making." *Id.* The growth of social media and the rise of a hyper-partisan climate did not change the calculus, because neither phenomenon is new and neither makes the type of misperception feared by government more realistic. JA 221-22.

The government's Inter- and Intra-branch Interests fared no better, because the government offered no evidence at all that the problem of AO employees' off-duty partisan political activity undermining the AO's reputation with Congress or federal judges was "real." JA 226, 229. Even if hypotheticals were permitted, moreover, the court was unmoved by the government's fears. The supposition that sophisticated political actors and federal judges would misunderstand ordinary acts of political participation as indicative of nefarious conduct was too far-fetched to credit. JA 226-27. As for the perceptions of congressional staffers, "allowing the challenged restrictions to stand because someone might twist routine civic expression to their political advantage strikes the Court as akin to endorsing the proverbial heckler's veto: muffling the speaker in anticipation of a hostile

overreaction by the listener," and "First Amendment freedoms of fair and dedicated professionals should not be sacrificed at the altar of partisan myopia." JA 230.

Independently of the failure of the government's interests to outweigh 1100 AO employees' core First Amendment rights, the court identified a second problem as well: the restrictions were not "reasonably necessary" to serve the government's asserted interests, JA 222—in other words, a problem of "fit." JA 223 n.15. The prior version of the Code contained sufficient restrictions—against using an employee's title or authority, federal resources, or work time in connection with partisan political activities—to avert the government's feared harms. JA 222-23. "[T]he government fails to explain why these more tailored standards of conduct are insufficient to address isolated instances of improper behavior that has rarely, if ever, arisen[.]" JA 223. The court's conclusion in this regard was bolstered by the Code's underinclusivity, as the Code did not address the problem of AO employees whose partisan activity prior to joining the AO could be discovered online. JA 223-24.

Regarding the seven restrictions the court concluded were unconstitutional, the court found that the Plaintiffs faced irreparable harm, and that the balance of equities and the public interest both weighed in Plaintiffs' favor. JA 231. Following this Court's approach to the scope of relief in *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) (en banc), the court enjoined the Director from enforcing, against any AO

employees except for the six high-level "designated employees" not at issue in this case, the Seven Enjoined Restrictions. JA 231-33.

The court held that the two remaining Challenged Restrictions—the Organizing Restriction and the Driving Restriction—passed muster, mainly because the court believed that the Hatch Act imposed the same restrictions on *all* executive-branch workers, and because the Supreme Court upheld those restrictions in 1973. JA 224-25. The court also opined that organizing partisan events and driving voters to the polls on behalf of a party "differ in kind" from other activities at issue because they "evince particularly strong commitments to enlisting partisan support." JA 225. Accordingly, the court held that the government's Public Perception Interest justified the Driving and Organizing Restrictions. *Id.*

Each side now appeals regarding the Challenged Restrictions on which it lost.

## SUMMARY OF ARGUMENT

At the heart of this case are two questions: Do the government's speculative fears of harm outweigh Plaintiffs' core First Amendment rights to engage in the most fundamental activities of democracy? And is the government's response to these potential harms appropriately tailored? To prevail, Director Duff must demonstrate that the answer to both is yes. He fails to carry his burden as to either inquiry.

*The parties' interests*. The Director does not dispute that the *NTEU* case provides the governing standard or that the burden on Plaintiffs' rights is severe. Nor

14

does he dispute that no harm has befallen the AO in eighty years of operation without its new Code. Moreover, his own declarants attest that even prior to the new Code's existence, the AO enjoyed an excellent reputation for nonpartisanship.

As a result, the government must rely on hypotheticals, positing that the public could notice AO employees' engagement in partisan activity and lose confidence in the judiciary. In light of the nebulousness of the reputational interest asserted, the district court permitted the government to try to carry the burden to justify its Code under *NTEU* by using realistic hypotheticals; even so, the government's arguments could not—and still cannot—justify the severe infringement on Plaintiffs' rights. The district court rightly recognized that crediting the Director's speculation requires following him down a five-step chain of contingencies in which each link in the chain is implausible—requiring, for instance, that members of the public who see AO employees engaging in political activities are *just* well-informed enough to know what the AO is, but *just mis*informed enough to believe that AO employees are in a position to subvert the adjudicative process. The Director's arguments also require accepting the unlikely premise that members of the public would see an AO employee's ordinary act of political participation—expressing a public opinion, displaying a yard sign, contributing money, attending a candidate's speech—and leap to the conclusion (which even the Director does not contend is accurate) that

15

AO employees would violate their professional obligations by distorting their work for partisan advantage.

The Director argues that the rise of social media makes the implausible plausible, because information can spread so fast. That contention does not address the fundamental problem with his position: no matter how many people know that an AO employee liked Joe Biden on Facebook or attended a Donald Trump rally, it is implausible to expect the public will therefore lose confidence in the judiciary. Moreover, AO employees could, until early 2018, engage in the activities the Director would ban, and they could do so again during the past two years while the new Code was enjoined—in other words, during the era of social media—yet the Director has not provided any example of actual harm.

The district court also rightly rejected the Director's alternative arguments that off-duty partisan activity by AO employees would undermine the agency's relationship with Congress or with judges themselves. The Director failed to carry his burden under *NTEU* to show that these harms were "real, not merely conjectural." The Director here argues that the district court held him to too high a burden and should have entertained his hypotheticals, but no authority supports the Director's proposed departure from the *NTEU* standard set by the Supreme Court. Moreover, his hypotheticals about inter- and intra-branch distrust are no more realistic than those about the loss of public confidence.

16

Before this Court, the Director stresses that the new AO Code is aligned with the restrictions applicable to courthouse employees around the country, but this proves little. He has made no record showing that the functions of AO employees and court staff are comparable such that restrictions applicable to one group should apply to the other. And he cites no authority validating the restrictions on courthouse staff, so the unspoken premise of his argument—that he has modeled the AO Code on valid restrictions—is untested.

*Tailoring*. The scope of the challenged restrictions is an independent reason to enjoin them. The Director has imposed on 1100 people far-reaching restrictions on political speech and assembly that the district court rightly deemed "as serious as they come." The Director would prohibit all his employees from a range of ordinary but fundamental political activities that most Americans (including most employees in the executive branch) take for granted: expressing political views, supporting candidates via donations, joining a political party, attending campaign events, and more. The district court rightly found that the AO's prior, narrower Code was sufficient to serve its interests. The Director's principal response is more speculation.

*The cross-appeal*. The district court erred in holding that the Driving and Organizing Restrictions pass constitutional muster. The court's thorough analysis of the weakness of the government's interests and its failure of tailoring, in the context

17

of Seven Enjoined Restrictions, applies just as forcefully to the other two restrictions. The court justified its differential treatment by comparing the Driving and Organizing Restrictions to those of the Hatch Act, but the court misconstrued the scope of the Hatch Act (as even the government agrees), and the court erred in relying on old Hatch Act cases from the 1940s and 1970s that have been eclipsed by modern First Amendment law.

In sum, the new AO Code bans far too much speech based on far too small a risk of harm. The Court should strike down all nine restrictions the Plaintiffs challenge; accordingly, it should affirm the district court's judgment in part and reverse in part.

## STANDARD OF REVIEW

Plaintiffs agree with the Director that this Court's review is de novo.

## ARGUMENT

## I.    The Government Bears A Heavy Burden To Justify *Ex Ante* Employee-Speech Restrictions, And The District Court Demanded The Proper Showing From The Director As To Each Of His Justifications.

The First Amendment commands the government to "make no law . . . abridging the freedom of speech." Although the government has more latitude to regulate the speech of its employees than that of the public at large, the Supreme Court has rejected the proposition that public employees may by virtue of their employment "be compelled to relinquish the First Amendment rights they would

otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

When the government imposes an *ex ante* restriction on employee speech (as distinguished from disciplining an employee for her speech after it occurs), its rule has "widespread impact" that "gives rise to far more serious concerns than could any single supervisory decision," because "such a ban chills potential speech before it happens." *United States v. Nat'l Treas. Employees Union*, 513 U.S. 454, 468 (1995) ("*NTEU*"). Accordingly, for *ex ante* restrictions on public employees' expression to survive, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government," which may include the appearance of impropriety. *Id.* at 468, 473 (citation and internal quotation marks omitted). The Court has recently reiterated how rigorous this analysis is:

> A speech-restrictive law with "widespread impact," we have said, "gives rise to far more serious concerns than could any single supervisory decision." Therefore, when such a law is at issue, the government must shoulder a correspondingly "heav[ier]" burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights. The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis.

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees*, 138 S. Ct. 2448, 2472 (2018) (quoting *NTEU*, 513 U.S. at 468 & 466, respectively; citations omitted; alterations

19

by the Court). The district court properly identified this framework as controlling. JA 205-08.

The court granted the government special dispensation with respect to one of its asserted interests—the Public Perception Interest—in light of the nebulous nature of that interest and the Court's analysis in *Williams-Yulee*. JA 210-13. Although it is understandable that the government need not point to a specific incident to demonstrate that, for instance, permitting a sitting judge to manage a partisan political campaign would undermine public confidence in judicial impartiality, the district court rightly required the government to assert "*realistic* hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." JA 211 (citation and internal quotation marks omitted, and emphasis added).

A "realistic" hypothetical, the court explained, must mean more than "an imagined scenario that has sound internal logic," lest the government "silenc[e] a swath of protected speech" "by conjuring situations that, while likely to create appearances of partisanship *if* they came to pass, have no reasonable prospect of occurring." JA 219. Thus, for the government's imagined scenarios to justify the Code, they need to be "reasonably likely to happen" without it. *Id.* History, although not dispositive, "certainly bears on how 'realistic' the hypothetical is." *Id.*

20

Demanding anything less than a "realistic" showing would have contravened *NTEU*, which cautioned that "a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms." 513 U.S. at 475. There, in striking down a ban on federal employees' receipt of honoraria for speeches and articles, the Court described the government's burden in these terms: "[The government] must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (cleaned up); *accord Sanjour v. EPA*, 56 F.3d 85, 98 (D.C. Cir. 1995) (en banc) (applying *NTEU* in striking down prohibition on EPA employees' receipt of travel expense reimbursements from private sources); *Lodge No. 5, Fraternal Order of Police v. City of Phila.*, 763 F.3d 358, 368-69, 384-85 (3d Cir. 2014) (applying *NTEU* in striking down prohibition on police officers' contributions to their union's political action committee). Of note, the government's speculation in *NTEU* itself failed to satisfy the standard because it was not realistic:

> Congress reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate [the] appearance of improper influence. Congress could not, however, *reasonably* extend that assumption to all federal employees below grade GS-16, an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles.

513 U.S. at 473 (emphasis added). Following the Supreme Court's holding in *NTEU*—and heeding the Court's further admonition that in this context "the government ... is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights," *Janus*, 138 S. Ct. at 2472—the district court properly refused to allow unreasonable speculation to defeat core First Amendment rights.

The Director does not dispute that the *NTEU* standard applies, *see* Gov't Open. Br. 26-27, or that the hypotheticals he asserts for the Public Perception Interest must be "realistic," *id.* at 30. He objects, however, to the district court's refusal to relax *NTEU* in evaluating the government's other asserted interests.

The district court correctly recognized that diluting the government's *NTEU* burden regarding interests other than the nebulous Public Perception Interest has no basis in precedent. JA 211. Interests based on the perceptions of judges or congressional staff are not "nebulous" in the same way: if either of these discrete and easily accessible groups of officials were distrustful of the AO because of its employees' political activities, it should not be hard for them to say so. Whereas both a special reason (nebulousness) and a specific Supreme Court decision (*Williams-Yulee*) justified departing from the letter of the *NTEU* standard with respect to the Public Perception Interest, no comparable logic or precedent supports the government's plea to water down *NTEU* for its other interests.

22

The government's authorities do not demonstrate otherwise. It cites three cases involving classic *Pickering* claims regarding *post hoc* discipline for a particular employee's speech. *See Baumann v. District of Columbia*, 795 F.3d 209, 212, 215, 218 (D.C. Cir. 2015) (police officer's challenge to *application* of department rule against disclosing confidential information whose release would impede an investigation; the court noted that the officer conceded the constitutionality of the general rule); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787-89 (7th Cir. 2015) (police officer's claim that chief retaliated against him for shouting insults and profanity at anti-abortion demonstrators); *Connick v. Myers*, 461 U.S. 138, 141 (1983) (prosecutor fired for circulating a questionnaire concerning internal office affairs). But the whole point of *NTEU* is that a broad challenge to an *ex ante* rule—like Plaintiffs' case here—triggers a stricter standard, as the district court recognized. JA 205 ("The *Pickering* test developed in cases where a public employer sanctioned an individual employee for past expression. In [*NTEU*], the Supreme Court modified the *Pickering* test to deal with broad, prospective speech prohibitions.").

The government pulls phrases out of context from *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), to create the proposition that a "real, not merely conjectural" harm can be shown where a risk is "self-evident[]" even if "the record contains no evidence of specific instances." Gov't Open. Br. 31-32 (quoting *Blount*, 61 F.3d at

944-45; internal quotation marks omitted). In fact, the "no evidence" statement was *a party's argument*, not the court's view. *See* 61 F.3d at 944 ("*[P]etitioner claims* there is no support for the Commission's finding that pay-to-play practices are prevalent in the negotiated municipal bond business, *because the record contains no evidence* of specific instances of quid pro quos." (emphasis added)). The court concluded that the record *did* contain a record of specific alleged abuses from 13 states and D.C., *id.* at 945, and the court identified specific conditions where it did not consider concrete proof necessary: where "the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Id.* Here there is no "apparent" harm or "likelihood of stealth"—much less the record of specific abuses present in *Blount*.

> *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), on which the government also relies, proves little about the propriety of speculation in considering the government's interest, because it involved an interest (preventing the disclosure of classified information) that no one would think (and no one apparently argued) was "conjectural" rather than "real." Surely if it had been required to document examples of leaks of classified information, the government could have provided them.

> Finally, the government's argument cannot succeed even on its own terms. Citing *Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) (en banc), and *Act Now to Stop*

24

*War & End Racism Coal. v. District of Columbia*, 846 F.3d 391 (D.C. Cir. 2017)—two cases that did *not* apply *NTEU*—the government argues that empirical evidence is not required when it is likely to be unavailable. Gov't Open. Br. 29-30. But that condition is not met here, as the government provides no reason why members of Congress or federal judges could not have provided declarations about their declining trust in the AO based on employees' partisan activities. That no such declarations are present here does not justify lowering the constitutional bar so that the government's weak case can clear it.

At bottom, the government's position is that the *NTEU* burden to show that it is responding to a "real" harm means no more than a burden to *articulate a possibility* of harm. But *NTEU* expressly contrasted the "real" harm the First Amendment demands with a "conjectural" harm of the kind the government asserted (and the Court rejected) in that case. In short, *NTEU* demands more than an *ipse dixit*. The district court rightly refused to jettison binding precedent from the Supreme Court or to freelance in making up a new standard.

## II.    The District Court Correctly Concluded That The Seven Enjoined Restrictions Violated Plaintiffs' First Amendment Rights.

The Seven Enjoined Restrictions (which prohibit expressing views publicly about a party or partisan candidate, displaying partisan signs/buttons, donating to a party or candidate, belonging to a party, or attending any of several types of party or partisan candidate events, fundraisers, rallies, or meetings) violate the First

Amendment twice over, as the district court rightly ruled. *NTEU* requires the government to establish two distinct propositions to prevail. First, its interest must outweigh the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression" in terms of a "necessary impact on the actual operation of the Government," that is "real, not merely conjectural," *NTEU*, 513 U.S. at 468, 475. Second, the speech restrictions at issue must "in fact alleviate these harms in a direct and material way" such that the restrictions are "reasonably necessary." *Id.* at 474, 475.

As the district court recognized, here the government had far too little reason for banning far too much speech. Each flaw in the government's position—the weakness of its reasons for banning 1100 employees' core political speech, and the lack of "fit" between the government's interests and its restrictions—is an independent reason that the Seven Enjoined Restrictions cannot withstand First Amendment scrutiny. Plaintiffs address each in turn.

### A. The district court correctly concluded that the Director's interests were insufficient to justify the restrictions given their enormous burden on Plaintiffs' core political speech.

At the outset, the district court accurately diagnosed the severity of the challenged restrictions: "they strike at the core" of 1100 employees' "right to participate in electing our leaders." JA 214-15. "There is no right more basic in our democracy than the right to participate in electing our political leaders. Citizens can

26

exercise that right in a variety of ways: They can ... urge others to vote for a particular candidate, volunteer to work on a campaign, and contribute to a candidate's campaign." *McCutcheon*, 572 U.S. at 191 (plurality opinion). "[S]peech about the qualifications of candidates for public office," is "at the core of our First Amendment freedoms." *Repub. Party of Minn. v. White*, 536 U.S. 765, 774 (2002) (cleaned up). "Indeed, the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cty. Dem. Cent. Comm.*, 489 U.S. 214, 223 (1989) (cleaned up). "No right is more precious in a free country than that of having a voice in the election of those who make the laws[.]" *Williams v. Rhodes*, 393 U.S. 23, 31 (1968) (cleaned up). The Challenged Restrictions also prohibit a broad range of associational activities—including attending and organizing events and being a member of a partisan political organization—long recognized as fundamental First Amendment freedoms. *See Tashjian v. Repub. Party of Conn.*, 479 U.S. 208, 214 (1986).

The Court was undoubtedly correct that the burden the Challenged Restrictions impose on AO employees' First Amendment rights "is as serious as they come." JA 215. The Director does not argue otherwise. *See* Gov't Open. Br. 24 (conceding that Plaintiffs' interest is "undeniably significant"). Accordingly, the heart of the dispute is over the government's justification for imposing this "severe" burden, JA 215, on Plaintiffs' rights.

The Director has advanced a shifting array of rationales from his announcement of the new Code to his brief to this Court. *See* JA 102-03 (preliminary injunction opinion). When he announced the new Code, he cited only his interest in aligning the restrictions on AO employees with those applicable to most courthouse staff (the Unity Interest). JA 102. At the preliminary injunction stage below, he added, and placed more emphasis on, a different interest: upholding the judiciary's reputation with the public (the Public Perception Interest). *See* JA 102-03. At summary judgment, the Unity Interest practically disappeared, the Public Perception Interest remained a primary focus, and two new interests made an appearance: upholding the AO's reputation with Congress (the Inter-branch Interest) and upholding the AO's reputation with federal judges (the Intra-branch Interest). *See* JA 189-90, 198-99 & n.6. Now before this Court, the Director seems to press all four, invoking the Public Perception, Inter-branch, and Intra-branch Interests explicitly while also implicitly appealing to the Unity Interest through his repeated discussions of the congruence between the new AO Code and the Courthouse Code. *See* Gov't Open. Br. 1, 14, 20, 42-43, 54.

None of the government's interests comes close to justifying the Seven Enjoined Restrictions, as the district court correctly held.

**1. The Public Perception Interest is undermined by the government's own evidence and depends on a lengthy chain of implausible assumptions.**

*a. The district court's analysis was correct.*

Although the Director's interest in preserving the public's perception of the judiciary is weighty, the district court correctly held that the government could not show this interest realistically justified the Seven Enjoined Restrictions in light of the severe burden on Plaintiffs' speech that the court identified. None of the government's attempts to resuscitate its draconian restrictions here cast doubt on the soundness of the district court's analysis.

The court discerned two problems with the government's hypotheticals imagining that political participation by AO employees would cause members of the public to leap to the unwarranted conclusion that federal judges' decisions were compromised by partisanship: the hypotheticals involved too long a chain of speculation, and the links of the chain were unrealistic.

First, the court identified five steps needed to connect the government's feared harm to the speech it sought to restrict:

> [M]embers of the public would [1] need to observe an AO employee engaged in partisan activity, [2] somehow come to know that the person in the photo or social media post is an AO employee, [3] understand that AO employees work with federal judges, but [4] mistakenly believe that they play a role in handling individual cases, and [5] assume—based on ordinary expressions of political preference—that the AO employee is so politically biased that she would be willing to violate

29

> her professional ethical obligations by attempting to sway the outcome
> of a case.

JA 220-21. Second, the links in this long chain "are fatally weak," because it is unrealistic that members of the public would both "so attuned to the inner workings of the federal judiciary that they have heard of the AO" but "at the same time misapprehend its basic role." JA 221. The court further refused to indulge the government's assumption that "the public would interpret routine acts of political expression—such as making a $100 donation or wearing a button or putting up a yard sign—as evidence of such extreme partisanship that the AO employees would choose to subvert the processes of judicial decision-making." *Id.*

The court's skepticism is both persuasive on its face and well supported by precedent. In *NTEU* itself, the Court refused to credit the assumption that the acceptance of honoraria by any of "an immense class of workers with negligible power to confer favors" would create an appearance of improper influence; more "powerful and realistic" to the Court was the "presumption that the federal work force consists of dedicated and honorable civil servants." *NTEU*, 513 U.S. at 476. That same common-sense approach underpins the district court's reasoning: the government cannot assume activities that might undermine public confidence in the judiciary were they performed by judges would have the same effect if pursued by AO employees—another large "class of workers with negligible power to confer favors." *Cf. Am. Postal Workers Union v. U.S. Postal Serv.*, 764 F.2d 858, 864–65

(D.C. Cir. 1985) ("We find it difficult to see how the public could conceivably lose confidence in the political neutrality of the Postal Service if off-duty, out-of-uniform postal employees were permitted to take part in voter registration drives conducted in postal lobbies by nonpartisan organizations[.]").

The court's analysis finds support in other factually analogous cases. For instance, *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971), though predating *NTEU*, applied similar reasoning to a ban like the one the AO has imposed. There, the city of Macon, Georgia, barred firefighters from engaging in political speech in support of a candidate (including displaying candidate bumper stickers), soliciting votes, or contributing money to a candidate. *Id*. at 457-58. Like the restrictions at issue in *Hobbs*, the new AO Code prohibits speech—right down to the bumper stickers and their 21st-century equivalent, the social media post—about partisan political candidates, along with a host of other expressive and associative activities. Anticipating the approach of *NTEU*, the court focused on the mismatch between the regulations' broad sweep and the vague interests asserted to justify them:

> We might ask whether a fireman's bumper stickers are so politically inflammatory that they would inhibit his firefighting ferocity or does the proscription of bumper stickers prevent extortion of political contributions? We think not. Macon has simply not aimed precisely at particular, specific evils which might justify political regulation. Bland assurances that the Macon scheme contributes to the "reasonable neutrality" of public employees or constitutes a "worthy aim" do nothing to overcome the fatal overbreadth of the charter and ordinance provisions in question.

*Id.* at 471. The court found the unconstitutionality of these restrictions "patently obvious," as they "proscribe[d] a great deal of political activity which is unrelated to the effective workings of the fire department." *Id.*; *accord Castle v. Colonial Sch. Dist.*, 933 F. Supp. 458, 461-62, 465 (E.D. Pa. 1996) (striking down school district policy that prohibited off-duty school employees from engaging in political activity at polling places that happened to be located on school grounds); *Goodman v. City of Kansas City*, 906 F. Supp. 537, 544 (W.D. Mo. 1995) (striking down city prohibition on city employees' display of bumper stickers, buttons, and yard signs).

### b. The only non-conjectural material in the record further undermines the Director's fears.

The AO was founded in 1939. Conspicuously absent from the government's fifty-nine pages of declarations is a single concrete, real-life example of a circumstance from the AO's eighty-year history in which an instance of political participation by an AO employee cast even the slightest aspersion on the integrity and impartiality of the judiciary. JA 218; *see also id.* ("[T]he government readily acknowledges that 'AO employees execute their job duties and tasks without regard for partisan considerations.'" (citing Defendant's statement of material facts at summary judgment)). That fact alone speaks volumes. In particular, the government put forward no evidence or argument at summary judgment that AO employees' partisan political activities during the years before the new Code (when AO employees could engage in a great deal of partisan political activity that the new AO

Code bans) or during the nearly two-year period between the district court's preliminary injunction and its permanent injunction (during which time the Seven Enjoined Restrictions were inoperative) damaged the judiciary's reputation or harmed it in any way.

Although the court permitted the government to rely on hypotheticals as to the Public Perception Interest, "history certainly bears on how 'realistic' the hypothetical is." JA 219. That the Director cannot muster a single concrete example of harm arising from his employees' political activities strongly suggests that these activities are harmless vis-à-vis the reputation of the judiciary. This conclusion is unsurprising, for, as the district court observed in its preliminary injunction ruling: "run-of-the-mill acts of civic participation like speaking out publicly about a candidate, joining or donating to a party, or attending a rally" are "actions that, in the eyes of a reasonable member of the public, reveal only that the employee is politically engaged and prefers a particular candidate or party," rather than "a justifiable inference that the judiciary has been infected by partisanship." JA 110.

Indeed, the only evidence in the record that speaks concretely to the reputation of the judiciary as that reputation *was actually perceived* by anyone (rather than as it might hypothetically be perceived under various scenarios of the Director's imagining) strongly supports the district court's analysis. Specifically, both the Cooney and Weich declarations submitted by the government reflect the opinions of

33

individuals who worked in Congress or in executive agencies between the years 1987 and 2012, *see* JA 161 ¶ 1; JA 172-73 ¶ 2—i.e., before the new AO Code was promulgated, when partisan political activity was permitted (and during the time when social media rose to prominence). Reflecting on their perceptions of the AO during their time in government, both Cooney and Weich aver that the AO's reputation was excellent even without the new Code's drastic restrictions on employees' First Amendment rights. *See* JA 164 ¶ 10 ("[T]he perception was that the AO consistently and reliably presented views that were solely in the best interest of the courts, without allowance for political considerations."); JA 177 ¶ 12 ("In my experience as a congressional staffer, the AO and its employees were uniformly perceived as non-partisan actors advocating on behalf of the federal Judiciary.").

Although the governments' declarants, including Cooney and Weich, also make statements supportive of the Director's parade of public-perception horribles, these invariably take the form of predictions about what *other*, often *unspecified*, individuals will think of some general category of *future* possible activities. *See, e.g.,* JA 178 ¶ 13 ("If AO employees were permitted to engage in the partisan political activities that are restricted by the AO Code of Conduct—and that are at issue in this case—it is reasonably likely that *observers would doubt* that the AO was approaching the business of the Judiciary without regard to politics, thereby undermining the federal Judiciary's reputation and effectiveness." (emphasis

34

added)); JA 170 ¶ 19 ("I believe that those activities, if permitted by AO employees and observed by the public, would make it more likely for Congress and *the public to perceive* the judiciary as an institution with partisan inclinations and associations[.]" (emphasis added)). The government did not seek to qualify these declarants as experts, and "non-expert witnesses cannot testify to what someone else thinks, feels, or intends." Mauet & Wolfson, Trial Evidence 60 (2d ed. 2001). Such predictions about what other individuals will think about possible future events is inadmissible lay opinion testimony, Fed. R. Evid. 701; *see United States v. Hampton*, 718 F.3d 978, 982-83 (D.C. Cir. 2013), and should therefore be disregarded. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). At a minimum, this Court should follow the district court's example and consider "gaps in the declarants' personal knowledge" as relevant to the "weight" of their evidence. JA 202 n.7.

The only evidence of any specific person's *actual* perceptions are the declarants' discussions of their own perceptions. And these eviscerate the Director's argument by showing that there was no problem with the AO's impartiality, actual or perceived, before the new Code came along. When AO employees were allowed to display bumper stickers supporting partisan candidates, speak publicly (including

on social media) about partisan candidates, give money to partisan candidates, attend fundraisers for partisan candidates, and join political parties, the AO's reputation was solid.

> c. *The government's hypotheticals are as implausible now as they were before the district court, and its attempts to bolster them by focusing on non-adjudicatory functions, partisanship, and social media are unpersuasive.*

As against the agency's entire history and its own evidence, the government falls back on the same mélange of implausible hypotheticals and attenuated connections that failed below. All of the scenarios the government cites to explain how political activities barred by the Seven Enjoined Restrictions could jeopardize the reputation of the federal judiciary, *see* Gov't Open. Br. 47-53, suffer from the same flaws—a long chain of speculation and weak probability at each link—found by the district court. The Director never answers the court's persuasive analysis showing that five steps would be required to link an AO staffer's political participation to harm to the judiciary's reputation (seeing the activity, knowing that the person engaging in it was an AO employee, knowing that AO employees work with judges, misunderstanding AO employees' role, and assuming based on the outside-of-work political activity that the staffer would compromise the judiciary's impartiality). *See* JA 220-21. The Director also cannot defend the weakness of those inferences—in particular, the perfect storm in which members of the public would both "so attuned to the inner workings of the federal judiciary that they have heard

of the AO" but also "at the same time misapprehend its basic role," JA 221, and the untenable assumption that "the public would interpret routine acts of political expression—such as making a $100 donation or wearing a button or putting up a yard sign—as evidence of such extreme partisanship that the AO employees would choose to subvert the processes of judicial decision-making." *Id.*

The government attempts to bolster its unrealistic hypotheticals in several ways: First, it argues that the court erred in focusing on the judiciary's reputation for integrity in adjudicating cases. Second, it cites recent examples of public attention to partisan activity by actors other than the AO. Third, it posits that social media's ability to spread information rapidly renders implausible assumptions plausible. None of these arguments withstands scrutiny.

First, the government argues that it need not connect AO staffers' political activities to the possibility of biased case adjudication but instead can rely on the possibility that other aspects of the AO's work, such as recommendations about amendments to the federal rules, will be compromised. Gov't Open. Br. 54. This approach ignores the Supreme Court's explanation of what the "public perception" interest is all about: the need to "assure its people that judges will *apply the law* without fear or favor[.]" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 438 (2015) (emphasis added). It is judges' special role as adjudicators, which the Court traced all the way back to the Magna Carta, that justified the Supreme Court's decision in

37

*Williams-Yulee* to recognize a "rare case[] in which a speech restriction withstands strict scrutiny." *Id.* at 444. The public must see the judiciary as neutral arbiters of disputes, not as neutral recommenders of amendments to federal procedural rules, which are more akin to rules issued by administrative agencies—whose employees are subject to much less restrictive rules under the Hatch Act, *see* Part II.B, *infra*. Accordingly, the government's hypotheticals in support of the Public Perception Interest must be limited to the function for which the public perception of integrity is a compelling interest: adjudicating cases. (And even if that weren't so, the chain of hypotheticals connecting AO staffers to biased rule recommendations is still almost as long and unrealistic as that connecting them to biased adjudications.)

Second, the Director cites examples of recent public controversies over government employees' political activities as evidence that, for any politically active public servant, reputational ruin for her agency is just one tweet away. But none of these examples suggests that the public will misperceive the role and integrity of *AO* employees as opposed to staffers of a better-known and more closely-watched government office. The Director's only concrete example involving the judicial branch is a controversy over actions of the Judicial Conference itself (not the AO), with particularly attention to an allegation regarding the donation history of a judge (not an AO employee). *See* Gov't Open. Br. 36-37. The Judicial Conference is made up of federal judges, who are lifetime appointees and whose general function

(adjudicating cases) most members of the public presumably understand. The same cannot be said for employees of the AO—an agency the Director concedes "may be unfamiliar" to "much of the general public." *Id.* at 43. That is surely an understatement. In a country where only 26% of respondents can identify the three branches of government, *id.*, does the Director seriously contend that the public is as familiar with the AO as with federal judges? With the United States Navy? *See id.* at 51-52, 55. Or that the political contributions of AO employees will provide the same excuse for partisan accusations as the headline-grabbing investigation of Special Counsel Robert Mueller? *See id.* at 22, 37-39, 48-49. Likewise, the Director cannot rely on attacks on U.S. government institutions by foreign actors *generally*, *see id.* at 39-40; he must show a reasonable possibility that the speech of *AO employees specifically* will be turned into effective political propaganda that undermines confidence in the judiciary. But the Director cannot explain why Russian propagandists (or opposition-research firms, another of his bogeymen, *see id.* at 40-41) would choose to focus their efforts on a small, obscure federal agency rather than politicians and institutions in the news every day.

Attempting to turn a weakness into a strength, the Director suggests that the public's unfamiliarity with his agency "only makes it more likely that [AO employees'] partisan political activity will be attributed to the Judiciary as a whole," because members of the public are "unlikely to differentiate employees of 'the

Administrative Office of the U.S. Courts' from employees who work in a courthouse." *Id.* at 43. But the Director does not explain why that hypothesis is more likely than that the words "Administrative Office" would prompt members of the public to conclude, correctly, that the AO consists of employees with administrative rather than adjudicative functions. The Director's guess is far too thin a basis for stripping 1100 employees of their constitutional rights.

The Director stresses that we live in a hyper-partisan climate, but as the district court observed, that's not a new state of affairs. JA 221. And the Director's argument about partisan distrust of the judiciary is far too general; again, he cannot realistically connect his argument to the conduct of off-duty *AO employees* specifically. General trends in public views about the judiciary as a whole, *see* Gov't Open. Br. 33-35, and a law review article about the effect of criticism *of the Supreme Court*, *id.* at 35 (citing Nelson & Gibson, *Has Trump Trumped the Courts?* NYU L. Rev. Online Symposium 32 (April 2018)), provide no reason to believe the activities of administrative employees of an obscure agency should fuel partisan distrust.

Third, the Director focuses on the effect of social media in spreading allegations of partisan bias. But as the district court observed, that phenomenon, like partisanship, is not new. JA 221. "[P]eople have been posting their personal comings and goings on Facebook and other sites for over a decade, with no documented ill-effect on the public's perception of the federal judiciary." *Id.* As the district court

explained, history bears on how realistic the government's predictions of harm are. That the Director can point to no problems involving AO employees at any time from the rise of social media to the present—during which time AO employees were free engage in partisan political activity either because the new Code had not yet taken effect (prior to 2018) or because it was enjoined (August 2018 to present)— reveals the implausibility of his speculation.

The most concrete component of the government's social-media argument— that partisan posts will be associated with the judiciary "[i]f AO employees identify as employees of the Judiciary or the AO on the sites on which the posts appear," Gov't Open. Br. 51—actually suggests that the new Code is unnecessary, because the pre-2018 Code already contained a restriction tailored to that scenario: "Employees who participate in political activity may not use their position, title, or authority in connection with the activity." JA 84 (2016 AO Code) § 260(a)(4).

More fundamentally, a medium is only as powerful as the messages it conveys. And whether information about AO employees' off-duty political activities is shared on Instagram, liked on Facebook, or beamed by satellite, the government has provided no reason to think that the involvement of AO staffers in "routine acts of political expression—such as making a $100 donation or wearing a button or putting up a yard sign" would induce members of the public to leap to the unwarranted conclusion that "AO employees would choose to subvert the processes

41

of judicial decision-making." JA 221. More harmless speech is still harmless. All the zeros in the world cannot add up to one.

In sum, lacking concrete evidence from the eighty-year history of the AO of threats to the public perception of the judiciary based on any of the activities banned by the Challenged Restrictions, the government relies on a series of hypotheticals that are impossible to credit, for the reasons powerfully explained by the district court and unrebutted here. The Public Perception Interest cannot justify the Director's severe restrictions on Plaintiffs' First Amendment freedoms.

### 2. The government fails to carry its burden as to the Inter-branch Interest.

The Director's asserted interest in the perception of the judiciary by other branches cannot justify the new Code because the government provides no evidence that the new Code is needed to protect these interests. Without concrete examples of harms to the Director's interests in the perception of his agency by congressional or executive-branch officials, the Director has, with respect to these interests, completely defaulted on his burden to show a "necessary impact on the actual operation of the Government," that is "real, not merely conjectural," *NTEU*, 513 U.S. at 468, 475.

Even if the Director were permitted to speculate, he would have to invoke the same far-fetched hypotheticals as for the Public Perception Interest, and add the further conjecture that sophisticated actors like congressional staffers won't

understand that AO employees can separate out their personal views and activities from their jobs—as they have apparently done successfully throughout the AO's eighty-year history, and as the government's own declarants affirm that they can do. *See supra* Part II.A.1.b (discussing Cooney and Weich declarations). Even the government itself does not argue that AO staffers will actually behave in a biased way. The government offers no reason to believe that well-informed government officials would adopt this unwarranted view.

Although the district court did not find it necessary to decide whether the government *would* win based on the Inter-branch Interest *if* permitted to speculate, the court explained the problematic implications of accepting the government's reasoning as a reason to deny employees their basic First Amendment rights:

> [A]llowing the challenged restrictions to stand because someone might twist routine civic expression to their political advantage strikes the Court as akin to endorsing the proverbial heckler's veto: muffling the speaker in anticipation of a hostile overreaction by the listener. For if the government's declarants are correct that members of Congress and their staffs would be likely to retaliate against the entire federal judiciary if they knew that an AO employee supported the opposite party, then the problem would lie with Congress (and indeed the country), not the AO. In this Court's view at least, the First Amendment freedoms of fair and dedicated professionals should not be sacrificed at the altar of partisan myopia.

JA 230. The Director offers no answer.

43

### 3. The government fails to carry its burden as to the Intra-branch Interest.

Like the Inter-branch Interest, the Director cannot demonstrate that the Intra-branch Interest is "real" rather than "conjectural." *NTEU*, 513 U.S. at 475. As with the Inter-branch Interest, the government has provided no evidence that Plaintiffs' First Amendment-protected participation in the democratic process actually harms judges' trust in the AO. JA 226.

Even if the Director were permitted to engage in speculation, his Intra-branch Interest would still fail, because it is simply "unrealistic," as the district court recognized. JA 227. Judges "appreciate that duty-bound professionals can offer objective advice on even the most sensitive topics regardless of whom they might support in the next election." JA 228.

The Director's argument also depends on attributing to federal judges an implausible amount of naivete: in the Director's telling, judges are both easily susceptible to being duped by scheming AO employees with partisan agendas and also easily reassured that AO employees could not possibly be up to any partisan scheming as long as they don't post partisan Facebook messages or contribute to a political campaign. The Director cannot justify deep restrictions to his employees' political activities based on such unlikely assumptions—which, it bears repeating, are far removed from any harms that are "real, not merely conjectural" and have a

44

"necessary impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468, 475.

Additionally, because judges, through the Judicial Conference, oversee the work of the AO, they have the authority to accept recommendations they find persuasive and reject those that they don't—or ask for further analysis if they need it. The judges thus are in the best position of anyone to evaluate the work of the AO on its merits rather than distorted by fear of partisanship. Nothing in the government's argument suggests any reason why judges cannot carry out the same responsibility all other federal government officials bear: to supervise staff who may have partisan views.

More fundamentally, the government's argument in this regard proves far too much. If the judges' interest in "unbiased" performance of AO employees—who ultimately report to the judges themselves—justifies sweeping restrictions on those employees' political freedoms, then any government agency could impose comparable restrictions on its employees to ensure their unbiased performance. The free-speech protections of *NTEU* would be a dead letter.

The district court correctly rejected the Intra-branch Interest.

45

### 4. The Unity Interest is patently insufficient to overcome Plaintiffs' First Amendment rights, and the existence of the Courthouse Code does not rescue the Director's other inadequate rationales.

Having lost on the three interests it pressed most heavily at summary judgment, *see* JA 189 (noting that the "government downplays its 'unity' rationale this time around"), the Director now seeks to resurrect the original interest he asserted—demonstrating the unity of purpose between the AO and the rest of the judiciary—via his repeated invocations of the Courthouse Code. *See* Gov't Open. Br. 1, 14, 20-21, 42-43, 54. Although the district court did not analyze the Unity Interest in the summary judgment ruling because of the way the Director framed his arguments, *see* JA 199 n.6, the district court's rejection of the Unity Interest in its preliminary injunction opinion—where the government did squarely rely on it—is sufficient rebuttal here:

> [A]chieving unity for its own sake cannot justify extending an existing speech restriction to a new group of employees whose job functions and workplace location distinguish them from those already covered. If uniformity were enough, the requirement that a restriction's scope be reasonably tailored would be meaningless ... . [I]f the AO wishes to treat its employees like courthouse employees with regard to their partisan activity, it must provide some independent reason justifying that equal treatment—i.e., that the AO employees' partisan activity would harm the government in some way and that the restrictions will mitigate that harm.

JA 102-03.

Perhaps the Director's frequent references to the Courthouse Code are aimed at implying that if the new AO Code resembles the Courthouse Code, the former must be valid. But that conclusion does not follow, for two reasons.

First, the Director has not established that the Courthouse Code regulates employees who are comparable to AO employees in terms of their relation to the government's asserted interests. Although the Director makes several generalizations comparing the two groups, *see* Gov't Open. Br. 42-43, these tellingly lack citations to the record. In fact, the Director created no record on this point—what the different types of employees regulated by the Courthouse Code do, where they work, how they might be perceived by the public—so there is no basis to infer that whatever restrictions would be justified as to courthouse employees would be justified as to AO staff. Indeed, to the extent the district court was able to make any comparisons between courthouse staff and AO staff based on the evidence in this case, it noted how these two groups *differed* in important ways: "unlike federal courthouse personnel, [the AO's] 1,100 or so employees toil mainly outside the public's view, and none of them are involved in handling or deciding individual cases." JA 188.

Second, the constitutional validity of the Courthouse Code is an untested assumption. It may be constitutionally permissible as to some or all court employees; it may not. But the government cites no authorities analyzing the question; it simply

47

offers the Courthouse Code as a presumptively valid baseline. In invoking the Courthouse Code for anything other than the weak Unity Interest, then, the Director proposes that AO employees' First Amendment rights may be eviscerated because he has imposed similar restrictions that may or may not be valid on other employees who may or may not be comparable. That is far too weak an inference to support stripping 1100 people of their right to participate in activities at the heart of the democratic process and at the core of the First Amendment.

### B. The district court rightly held that the government failed to tailor the Challenged Restrictions to realistic harms.

Beyond the government's failure reasonably to demonstrate a connection between the activities prohibited by the new Code and realistic potential harms to the judiciary's image, the breadth of the new Code's restrictions independently dooms them.

*NTEU* requires that the breadth of *ex ante* speech restrictions be "reasonably necessary to protect the efficiency of the public service." 513 U.S. at 474; *accord Sanjour*, 56 F.3d at 95 (finding "the obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions" to be of "[f]oremost" concern); *see generally McCutcheon*, 572 U.S. at 218 (plurality opinion) ("In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but reasonable[.]" (citation and internal quotation marks omitted)). The government disputed this requirement

48

below, *see* JA 223 n.15 (rejecting the government's argument), but does not do so here, *see* Gov't Open. Br. 27 (acknowledging the "reasonably necessary" requirement).

The district court rightly held that that the government failed it. *See* JA 222-24. Although the government need not use the "least restrictive means," here it used practically the *most* restrictive means, as the Challenged Restrictions "entirely ban some 1,100 citizens from engaging in bedrock First Amendment expression—even though the activities would occur on the employees' own time, without the use of any government resources, and without a readily identifiable link to the AO." JA 215. The Code is, in *NTEU*'s words, "crudely crafted" and not "a reasonable response to the [government's] posited harms." 513 U.S. at 476-77.

As the district court found, the previous version of the Code was sufficient to serve the government's purported interests because it forbade engaging in partisan political activity at work, when using government resources, or when identifying oneself with the AO, *see* JA 222 (discussing JA 85 (2016 AO Code) § 260(c)), and also required that AO employees "act impartially and not give preferential treatment to any private organization or individual" and to "observe high standards of conduct so that the integrity and independence of the judiciary are preserved." *Id.* (quoting JA 71-72 (2016 AO Code) § 220 & § 220(d)(1); internal quotation marks omitted).

The government provides no sound reason why its previous rules were insufficient to protect judicial integrity, particularly in the absence of a history of problems. *See* JA 223. The government insists that the prior restrictions were insufficient because they did not cover enough activities, including "normal partisan conduct," Gov't Open. Br. 57, but that argument assumes its own conclusion.

Taking a different tack, the Director posits that individualized, *post hoc* enforcement of the pre-2018 Code could raise a different problem in that disciplinary actions could themselves be viewed as partisan. *See id.* But that possibility is just as hypothetical as all of the Director's other arguments; he has not cited a single example in which the AO had to discipline one of its employees under these provisions, much less that it created a problematic perception of partisanship. Sweeping, *ex ante* speech restrictions are a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," *NTEU*, 513 U.S. at 467, and "chill[] speech before it happens," *id.* at 468. Thus, the broad-brush approach of the Challenged Restrictions is far more problematic than a tailored regime of individually focused, *post hoc* discipline.

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) (en banc), provides an illustrative contrast from this case in terms of the type of tailoring that passes constitutional muster. There, the court upheld a restriction on political contributions by federal contractors. *Id.* at 3. Unlike the new AO Code, that regulation was targeted narrowly

to a specific and demonstrated problem: "Congress enacted [the provision] in the aftermath of a national scandal involving a pay-to-play scheme for federal contracts. … And it was followed by subsequent scandals that led to further legislative refinements, again motivated by concerns over corruption and merit protection." *Id.* at 14. The necessary tailoring was present because the contribution ban there left the plaintiff contractors "free to volunteer for candidates, parties, or political committees; to speak in their favor; and to host fundraisers." *Id.* at 25. None of these alternative avenues for political participation remains open to Ms. Guffey or Ms. Smith or their 1100 colleagues at the AO under the new Code.

Another comparison provides additional perspective on how poorly tailored the Challenged Restrictions are: the new Code would restrict the speech of AO employees more drastically than the Hatch Act's restrictions on executive-branch employees. The government admits as much. Gov't Open. Br. 41. Of the nine types of political activity barred under the Challenged Restrictions, eight of them are permitted for ordinary executive-branch employees as long as the employees are not engaging in these activities on duty, in uniform, in a government room or building, or using government property; the ninth (contributing funds) is restricted only as to political action committees and even then only partially. *See* 5 U.S.C. §§ 7323(a) &

51

7324(a); 5 C.F.R. §§ 734.202-.06 & .208.[4] Seven of the nine Challenged Restrictions are permitted in some manner even for "further restricted" employees such as FBI agents, CIA analysts, DOJ prosecutors, and FEC staff. *See* 5 U.S.C. § 7323(b); 5 C.F.R. §§ 734.401, 734.402, 734.404, 734.410, 734.412. Thus, the AO's new Code imposes more severe restrictions on a judicial-branch information-technology specialist than Congress has imposed on employees of the Federal Election Commission. The new Code forbids more political activity by a judicial-branch attorney who runs trainings for federal public defenders than by an executive-branch attorney with the power to decide whether or not to prosecute elected officials for alleged violations of law. The potential for mischief or appearance of impropriety arising out of federal employees' partisan activities is not difficult to recognize when the employees in question are responsible for enforcing the nation's election laws or prosecuting crimes. Such mischief is nearly impossible to imagine when the employees in question are responsible for managing the courts' electronic case filing system.

Plaintiffs do not hold out the Hatch Act as an ideal balance between anti-corruption interests and political speech and association rights. Nevertheless, the Hatch Act provides a useful reference point: if Congress does not find it necessary

---

[4] The district court erroneously states, in analyzing the Driving and Organizing Restrictions, that these apply more broadly. *See* JA 224. Plaintiffs explain in their argument about those two restrictions, Part III *infra*, why that view is incorrect.

to ban any of these activities for most federal workers—perhaps because Congress credits "the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants," *NTEU*, 513 U.S. at 476—there is no reason to consider these activities incompatible with the work of the federal judiciary. Just as the interest in judicial neutrality is of great importance, so does it "seem[] fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65 (1973) ("*Letter Carriers*"). That Congress has made the considered judgment that some of the most powerful civil servants in the executive branch need not comply with the restrictions contained in the new AO Code underscores how anomalous it would be to hold otherwise here.

Finally, the district court's concerns about tailoring were buttressed by the AO Code's underinclusiveness. Although the district court did not treat underinclusiveness as a freestanding reason to enjoin the Code's provision, it followed this Court's lead in recognizing underinclusive regulations as suspect. JA 223-24; *see Sanjour*, 56 F.3d at 95-96. Here, as the district court recognized, "the hypotheticals feared by the government could still occur even if the Code were in effect." JA 223. That is, the new Code cannot prevent AO employees from being

"outed" as having personal partisan political views of one kind or another if anyone cares to "out" them—the harm the Director fears. The views of any AO employees who expressed themselves politically on social media prior to joining the AO are just as easy to find as if they post those views today. *See id*. And there are many ways in which an AO employee might signal a strong partisan view without running afoul of the new Code—being spotted at a Michael Moore movie or reading Barack Obama's *A Promised Land* on the Metro suggests a person's partisan orientation just as strongly as attending a Donald Trump rally, yet the former activities are permissible under the new Code while the latter is not. Should AO employees be banned from going to political movies or reading political books on public transit? Any attempt to prevent AO employees from ever be seen in a partisan light is doomed to failure.

\* \* \*

In sum, the district court thoroughly evaluated the Seven Enjoined Restrictions under the correct legal standards and persuasively demonstrated that they flunk the *NTEU* test both because they are inadequately justified and because they are insufficiently tailored. This Court should affirm that these prohibitions on the core political speech of 1100 employees violate the First Amendment.

**III.    The District Court Erred In Upholding The Driving And Organizing Restrictions, Which Violate Plaintiffs' First Amendment Rights.**

The Court upheld the Driving and Organizing Restrictions because "a member of the public could more reasonably conclude that these two activities demonstrate a partisan tie so enduring that it could inspire an AO employee to inject partisan affiliations into her performance of day-to-day duties," even though "that perception would be mistaken." JA 225. But these restrictions are no more justified by the government's interest than the seven that the court correctly held unconstitutional, and the court's reasoning to the contrary rests on several errors.

As a threshold matter, the same *NTEU* standard that the Court properly applied to the Seven Enjoined Restrictions, *see* Part I *supra*, applies to the Driving and Organizing Restrictions as well. Unfortunately, the district court did not apply the standard as rigorously to these two restrictions as to the others.

The Driving and Organizing Restrictions do not cover activity raising special concerns about the visibility of AO employees engaging in it. When an AO employee drives someone to a polling place or organizes an event for a partisan candidate, she is no more visible than when she engages in activity that is covered under the seven restrictions that were enjoined by the district court. As compared with being a vocal commentator on social media, an AO employee driving voters to the polls is far *less* likely to be observed: an observer would not only need to see the car at the moment it arrives at the polls, but also be close enough to ascertain the

55

identity of the driver through the window of the car, then recognize her as an AO employee, *then* somehow discern that she had driven voters to the polling place *in coordination with a political party* as opposed to in coordination with a non-partisan voter-assistance organization[5] or with no organization at all (for instance, giving a ride to friends). And there is no reason to believe that a person who organizes a political event (as opposed to the event host) is visible to anyone when she arranges a venue or coordinates logistics for an event.

Nothing in the government's declarations suggests that the Driving and Organizing Restrictions are especially necessary as compared with the Seven Enjoined Restrictions. On the contrary, the Director's declaration treats the activities barred by the Driving and Organizing Restrictions as comparable to several that the district court held could *not* be constitutionally prohibited by the AO Code: attending partisan fundraisers, making political contributions to a party or partisan candidate, and being a member of a partisan political organization. *See* JA 152 ¶ 43.

Accordingly, the same sound reasoning by the district court that applied to the Seven Enjoined Restriction applies to the Driving and Organizing Restrictions as well. The chain of speculation connecting the Driving and Organizing Restrictions to the Public Perception Interest is just as long and just as weak. *See supra* Part

---

[5] *See, e.g.*, Carpool Vote, Frequently Asked Questions, *at* carpoolvote.com/faq (last visited Dec. 7, 2020) ("We are nonpartisan. This service is open to any driver or rider—no matter what their political views.").

II.A.1. The government offers no evidence that the activities covered by the Driving and Organizing Restrictions cause "real" harm to Inter- or Intra-branch perceptions of the AO. *See supra* Part II.A.2-3. The Unity Interest is insufficient on its face to overcome Plaintiffs' political-participation rights under the First Amendment. *See supra* Part II.A.4. And the complete ban on the activities in question is inadequately tailored to the government's interest. *See supra* Part II.B.

The district court justified treating the Driving and Organizing Restrictions differently from the Seven Enjoined Restrictions mainly because of the Hatch Act's treatment of the various restrictions. But the court's brief analysis, JA 224-25, contained three errors: it misread the Hatch Act and therefore overstated the scope of its prohibitions; it relied on precedents that have been overtaken by the Court's modern First Amendment jurisprudence; and it indulged an assumption that it had already thoroughly (and correctly) discredited as unrealistic.

First, according to the district court, the Driving and Organizing Restrictions "mirror those that the Hatch Act places on *all* executive-branch employees, who are prohibited from 'tak[ing] an active part in political management or political campaigns.'" JA 224 (quoting 5 U.S.C. § 7323(b)(2)(A); emphasis in original). That is incorrect. The provision quoted, § 7323(b)(2)(A), applies only to "employee[s] described under subparagraph (B)," and that subparagraph refers to employees of 15 specific agencies: the Office of Special Counsel, the Merit Systems Protection

57

Board, and 13 others that relate to elections, law enforcement, intelligence, or national security (such as the FEC, FBI, CIA, and Secret Service). *See* 5 U.S.C. § 7323(b)(2)(B)(i).[6] Although executive-branch employees in these limited categories (known as "further restricted" employees under the Hatch Act) face driving and organizing restrictions, 5 C.F.R. §§ 734.410(b) & 734.412(c), the mine-run of federal employees do not. *See* 5 C.F.R. § 734.206(d) (permitting driving) & .208 (Examples 6 & 9) (permitting organizing). Even the Director acknowledges as much. *See* Gov't Open. Br. 20 n.3.

In analogizing to the executive-branch employees covered by the Hatch Act, the Court should recognize that AO employees like Christine Smith and Lisa Guffey are clearly equivalent to the bulk of the federal workforce, not the handful of federal employees who face heightened restrictions because of their sensitive roles in law enforcement, national security, election oversight, or the like. AO employees do not perform any functions remotely comparable to these. Although members of the AO play an important role in supporting the work of the judiciary, they lack the power of "further restricted" employees in terms of adjudicatory, investigatory, or final decision-making authority. Indeed, treating AO employees like "further restricted"

---

[6] Another subdivision, § 7323(b)(2)(B)(ii), adds to this list employees described in four other sections of Title 5: §§ 5372 & 5372b (administrative judges), § 5372a (contract appeals board members), and § 3132(a)(4) (career appointees to the Senior Executive Service).

employees would subject them to restrictions on political activity that outstrip those applicable to some federal employees with actual *adjudicative* authority.[7]

Second, the district court's Hatch Act analogy is further undermined by its shaky precedential foundation. The court relied on three cases that predate *NTEU*, two of which also predate *Pickering*, and one of which predates *all* modern First Amendment jurisprudence. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947); *Ex parte Curtis*, 106 U.S. 371 (1882).

The analysis in the forty-seven-year-old *Letter Carriers* has been eclipsed by modern doctrine. The *NTEU* standard is stricter than the one applied in *Letter Carriers*: *NTEU* noted that *Letter Carriers* "did not determine how the components of the *Pickering* balance should be analyzed in the context of a sweeping statutory impediment to speech," and the Court went on to hold that with respect to that type of restriction, "the Government's burden is greater ... than with respect to an isolated

---

[7] For instance, the Department of Veterans Affairs assigns certain "administrative decisions affecting permanent entitlement to benefits" not to administrative judges but to "veterans service representatives." *See* U.S. Dep't of Vets. Affairs, General Information on Administrative Decisions, M21-1, Pt. III, Subp. v, Ch. 1, at III.v.1.A.1.b—Who Makes, Documents, and Approves Administrative Decisions, *at* https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000014216/M21-1-Part-III-Subpart-v-Chapter-1-Section-A-General-Information?query=%22veterans%20service%20representative%22 (last visited Dec. 17, 2020). Yet these officials are not "further restricted" under the Hatch Act.

disciplinary action." *NTEU*, 513 U.S. at 467-68. And the Court has become far less willing than it was in *Letter Carriers* to defer to congressional judgment (to say nothing of the judgment of an appointed agency official like Director Duff) when political participation is at stake. *Compare Citizens United v. FEC*, 558 U.S. 310, 361 (2010) ("Here Congress has created categorical bans on speech that are asymmetrical to [its interest].")*, and McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality opinion) ("Campaign finance restrictions that pursue other objectives [than preventing quid pro quo corruption], we have explained, impermissibly inject the Government into the debate over who should govern. And those who govern should be the *last* people to help decide who *should* govern." (citation and internal quotation marks omitted))*, with Letter Carriers*, 413 U.S. at 567 ("Perhaps Congress at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it.").[8]

---

[8] The Court has never had the opportunity to revisit its holding in *Letter Carriers* that Congress could impose broad restrictions on federal workers' political activities under the version of the Hatch Act then in effect, because Congress substantially loosened these restrictions in the Hatch Act Reform Amendments of 1993. *See* Cynthia Brown & Jack Maskell, Cong. Res. Serv., *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age* 1-2 (Apr. 13, 2016), *at* https://fas.org/sgp/crs/misc/R44469.pdf. The House Report on those Amendments reflects the judgment that the prior version of the Act had unnecessarily trammeled the rights of federal employees: "The committee finds that the supposed evil of

(footnote continues next page)

The 1947 decision in *Mitchell* is on even weaker footing today. It is no wonder that the Court in *Mitchell* upheld the Hatch Act—it would be two decades before *Pickering* applied the First Amendment to government-employee speech restrictions to begin with. *Mitchell* articulated a broad theory of congressional speech-regulating power that is entirely incompatible with modern First Amendment jurisprudence: "The determination of the extent to which political activities of governmental employees shall be regulated lies primarily with Congress." 330 U.S. at 102. By contrast, in *NTEU*, the breadth and lack of tailoring of the regulation at issue—a regulation that struck less closely to the core of the interests protected by the First Amendment than the new AO Code—doomed it. *See* 513 U.S. at 473.[9]

And, of course, the 138-year-old decision in *Curtis* predates not just *NTEU* and *Pickering* but also the very foundations of modern First Amendment law in the first quarter of the 20th century.

_____

political partisanship by classified employees of Government is neither so imminent nor so apparent as to justify an intrusion into individual rights and democratic values as profound as the Hatch Act imposes." H.R. Rep. No. 103-16, at 5 (1993) (citation and internal quotation marks omitted).

[9] Congress itself has backed away from the judgment of *Mitchell*. The House Report on the Hatch Act Reform Amendments of 1993 quoted approvingly from Justice Black's dissent in the case: "'Legislation which muzzles several million citizens threatens popular government, not only because it injures the individuals muzzled, but also, because of its harmful effect on the body politic in depriving it of the political participation and interest of such a large segment of our citizens.'" H.R. Rep. No. 103-16, at 5 (1993) (quoting *Mitchell*, 330 U.S. at 111 (Black, J., dissenting)).

In a nod to more recent developments, the district court did note that the Supreme Court cited *Letter Carriers* in *Citizens United* as support for the proposition that "there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech," JA 224, but that anodyne generalization hardly constitutes a full-throated endorsement of *Letter Carriers*' holding or methodology, both of which have been eclipsed by subsequent cases and statutes.

Finally, the Court thought that seeing an AO employee organizing a partisan political event or driving voters to the polls could cause a member of the public to suspect partisan job performance—even though "that perception would be mistaken"—because "a member of the public may not fully appreciate that an AO employee would have no ability to sway the outcome in a given case." JA 225. But the chain of speculation necessary to reach that conclusion is no shorter or more realistic than the chain that failed to justify the Seven Enjoined Restrictions, as explained above.

Because neither the Hatch Act nor the decisions upholding it provide a good reason to subject AO employees to the Driving and Organization Restrictions, and because these restrictions apply to activities that are no more visible than those banned by the other Challenged Restrictions, the same thorough and correct reasoning by the district court in striking down Seven Enjoined Restrictions should apply to the Driving and Organization Restrictions as well.

**IV.    The Director Does Not Dispute That The Remaining Factors Of The Preliminary Injunction Analysis Favor Plaintiffs Or That The Scope Of The Injunction Was Proper.**

The district court correctly held that, Plaintiffs having prevailed on the merits, injunctive relief was warranted because Plaintiffs faced irreparable harm to their First Amendment rights and because the balance of equities and the public interest supported enjoining the challenged restrictions. JA 231. On appeal, the Director does not dispute these conclusions and therefore has waived any challenge to them.

The district court also determined, following this Court's decision in *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) (en banc), that the injunction should extend to protect all AO employees except the six high-level "designated employees." JA 232-33. The Director does not take issue with the scope of the injunction and has therefore waived any challenge on that score.

For the same reasons the district court found that injunctive relief was warranted against the Seven Enjoined Restrictions as to all AO employees except the six high-level "designated employees," injunctive relief of the same scope is also warranted against the Driving and Organizing Restrictions because they, too, violate Plaintiffs' First Amendment rights and there is no reason that the injunctive factors or the scope issue should be assessed any differently for the Driving and Organizing Restrictions as for the rest.

# CONCLUSION

The Court should affirm the district court's judgment as to the Seven Enjoined Restrictions and reverse as to the Driving and Organizing Restrictions.


December 18, 2020                              Respectfully submitted,

                                              */s/ Scott Michelman*
                                              Scott Michelman
                                              Arthur B. Spitzer
                                              Michael Perloff
                                              American Civil Liberties Union
                                                 Foundation of the District of Columbia
                                              915 15th Street NW, Second Floor
                                              Washington, DC 20005
                                              (202) 601-4267
                                              smichelman@acludc.org

*Attorneys for Plaintiffs-Appellees/Cross-Appellants Guffey and Smith*

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) for a cross-appeal, because it contains 15,253 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

*/s/ Scott Michelman*
Scott Michelman